**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Joseph IENCO, Defendant–Appellee.**

No. 98–2487.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1999.

Decided June 24, 1999.

Rehearing Denied Aug. 27, 1999.

Barry Rand Elden (argued), Colleen D. Coughlin, Office of the United States Atty., Criminal Div., Chicago, IL, for Plaintiff–Appellant.

Jeffrey N. Cole (argued), Andrew T. Staes, Cole & Staes, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, FLAUM, and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

This court is reviewing Joseph Ienco's case for a third time. Following a jury trial, the defendant was convicted of a number of federal crimes arising out of an unsuccessful extortion attempt. The crimes included conspiracy to commit extortion in violation of 18 U.S.C. § 1951, interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952, and using or carrying firearms during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1). In *United States v. Ienco*, 92 F.3d 564 (7th Cir.1996) ("*Ienco I*"), we remanded, because of an erroneous evidentiary ruling, for a new determination of whether the defendant's motion to suppress certain evidence later admitted at his trial should have been granted.[1] In *United States v. Ienco*, 126 F.3d 1016 (7th Cir.1997) ("*Ienco II*"), after the district court had partially granted Ienco's motion to suppress and the government appealed from that order, the defendant moved to dismiss the government's appeal for lack of jurisdiction because the district court had not yet disposed of the entire motion. Without reaching the merits of the appeal, we denied the motion to dismiss, but remanded the case with instructions that the district court enter an order ruling on the

---

**1.** We also vacated the judgment of conviction on the gun charge in light of *Bailey v. United* *States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

motion to suppress in its entirety, noting that appeal from that order would position us for the current appeal. The district court granted the full motion to suppress and, for the reasons stated herein, we affirm.

## I. FACTUAL BACKGROUND

This case begins with Jerome Greenberg, a seller of clothing "seconds" in Chicago. In August of 1994, Greenberg received a phone call from New York informing him that he owed the caller $140,000 on a shipment of denim shorts from Tunisia. Greenberg refused to pay, claiming that he had not agreed to such a price. As a result of his refusal, Greenberg received a visit by the defendant, Joseph Ienco, and his associate, Gregory Iovine, on behalf of the New York seller.

Ienco and Iovine, armed with two pistols, traveled by train from New York to Chicago, where they rented a room at the Days Inn on Lake Shore Drive. They also rented a minivan which, on August 29, 1994, the pair drove to 2728 North Hampden Court, the building in which Greenberg had his office. The two men entered the building around noon without being buzzed in (someone had propped the door open), and barged into Greenberg's office unannounced. Ienco told Greenberg that he and Iovine were there to collect the money for the aforementioned goods. When the visit became unfriendly, Greenberg's secretary, at his instruction, called the police. Ienco and Iovine left immediately, but not before promising Greenberg that they would return.

That afternoon, at approximately 5:00 p.m., Ienco and Iovine, armed with their weapons, drove the minivan back to Greenberg's neighborhood. They parked, leaving the guns in the van, and entered the building. Greenberg saw them coming into the building on his closed circuit television monitor and called the police.

Greenberg told his nephew, Ross Berman, to go downstairs and watch for the two men.

At 5:25 p.m., a police dispatcher sent out a message stating: "Disturbance with two men in a lobby, 2728 North Hampden Court. 2728 Hampden Court. Greenberg is your complainant. You'll find him on the second floor in Apartment 207." Chicago Police Officers Angarone and McGann responded to the call. Berman intercepted their police car as it approached the building and, pointing toward 2728 North Hampden Court, told the officers "they're in the building." Berman appeared nervous and agitated.

As the officers pulled into the driveway, Ienco and Iovine, wearing business suits, exited the building and walked toward them. Officer Angarone got out of the car and, with his hand on his gun, said "stop, don't move." He did not draw his gun. He told the men that he had received a disturbance call and asked if they had seen anything in the building. They said no. When Angarone asked whether they lived in the building, Ienco told him that they were visiting a friend.[2] Angarone then asked how Ienco and Iovine were getting around and Ienco said "by cab." The officer requested identification and received their driver's licenses. Angarone patted both men down, and took their wallets, money and a set of keys from Ienco's pocket. Neither Ienco nor Iovine were armed. The officer returned the cash and keys but kept the wallets and driver's licenses.

Angarone told the men to get in the backseat of the police car while he checked out the situation inside the building. The men complied and entered the car, but they did not affirmatively consent to enter or remain in the vehicle. Ienco and Iovine were not handcuffed; however, the police car was locked from the outside—it could

---

**2.** Officer Angarone originally testified that Ienco said he was visiting a friend named Greenberg. The district court determined that his testimony was not credible on this point.

not be opened from the inside—and the men were not free to leave. They waited in the car for approximately thirty minutes while the officers interviewed Greenberg, who eventually signed a written complaint implicating the two men. At 6:00 p.m., Angarone formally arrested Ienco and Iovine and took them to the police station.

At 10:00 p.m., the police car was routinely searched and the keys to the rented minivan were found in the vehicle. The van was subsequently located and searched, and the police discovered two pistols (including one with a silencer) and a briefcase. At approximately 4:15 a.m., Iovine, after being questioned in custody, gave a statement directing the police to the hotel room at the Days Inn on Lake Shore Drive where the police found additional incriminating evidence.

Prior to trial, Ienco and Iovine filed a joint suppression motion which Judge Duff denied. Iovine then negotiated a plea agreement and testified at trial against Ienco, who was convicted of the extortion related crimes. On appeal, this court remanded for a new suppression hearing because the trial judge erroneously prevented defense counsel from cross-examining a witness who may have been critical to the credibility of Ienco. On remand, Ienco's case was re-assigned to Judge Coar who granted the defendant's new motion to suppress, finding that Ienco was unlawfully arrested when he was initially placed in the police car and that the evidence found in the subsequent van and hotel room searches, as well as Iovine's testimony, were inadmissible because of the Fourth Amendment violation.

## II. ANALYSIS

The government raises three issues on appeal. First, it argues that the district court erred in finding that the initial detention violated the Fourth Amendment because it was a permissible *Terry* stop.

Second, it urges that the district court erred in concluding that the evidence obtained from the search of the van was inadmissible fruit of the unlawful search. Third, the government claims that it was error to suppress Iovine's testimony on the same grounds.[3]

### A. *Terry* stop.

The district court concluded that Ienco's arrest violated the Fourth Amendment because he and Iovine were instructed to enter the police car from which neither could exit, while the police maintained possession of their personal effects. The government argues that this was error because the initial detention of Ienco and Iovine, prior to their formal arrest at 6:00 p.m., was a permissible *Terry* stop based on Officer Angarone's reasonable, articulable suspicion that Ienco and Iovine were the same men mentioned by Greenberg in the 911 call. Consequently, the government maintains that no arrest of Ienco and Iovine occurred until 6:00 p.m. when the officers returned to the car after talking to Greenberg. In the proceedings below, Officer Angarone claimed that he never ordered the men to stop, but that he said something to the effect of "fellas, can I talk to you for a second." Angarone stated, however, that if he had said "stop," then he would have been telling Ienco and Iovine, not asking them, to stop. At the outset, Officer Angarone's testimony, together with his statement that Ienco claimed to be visiting a friend named Greenberg, would appear to support an appropriate *Terry* stop. However, Judge Coar found that Officer Angarone had not testified credibly about his version of the initial contact, and instead believed Ienco's version of events. Specifically, Judge Coar found that Officer Angarone said, "Stop, don't move," with his hand on his gun. At that point, the defendant argues, the "seizure" of the men began and there

**3.** The government does not appeal Judge Coar's ruling suppressing the evidence found in the hotel room search.

could have been a lawful *Terry* stop only if Officer Angarone had a reasonable articulable suspicion that the two men were the ones mentioned in the police dispatch. Case law and the district court's unchallenged findings preclude such a conclusion.

■■■■ The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. In *Terry v. Ohio*, the Supreme Court noted that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Thus, under *Terry*, a police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity is afoot. *Id.* at 21–22, 88 S.Ct. 1868. Reasonable suspicion has been defined as "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). While reasonable suspicion requires something less than what is necessary to show probable cause, it requires more than a mere "hunch." *United States v. Tipton*, 3 F.3d 1119, 1122 (7th Cir.1993); *United States v. Quinn*, 83 F.3d 917, 921 (7th Cir.1996). We have held that "in determining whether a particular police-citizen encounter was supported by reasonable suspicion, courts must consider the totality of circumstances known to the officer at the time of the stop." *Quinn*, 83 F.3d at 921 (citing *United States v. Cortez*, 449 U.S. at 417–18, 101 S.Ct. 690). Moreover, "in evaluating the reasonableness of an investigative stop, we examine first whether the officers' action was justified at its inception and, second, whether it was

reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Smith*, 3 F.3d 1088, 1095 (7th Cir.1993) (quoting *United States v. Glenna*, 878 F.2d 967, 971 (7th Cir.1989)). The reasonableness of the stop may depend, in part, on the extent of the intrusion. *United States v. Griffin*, 150 F.3d 778, 783 (7th Cir.1998).

■■■■ To qualify as a lawful *Terry* stop, a detention must be limited in scope and executed through the least restrictive means. *United States v. Novak*, 870 F.2d 1345, 1352 (7th Cir.1989). A seizure becomes an arrest when "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Corral–Franco*, 848 F.2d 536, 540 (5th Cir.1988) (citing *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.1988)). A district court's determination as to whether the defendant was subjected to a lawful *Terry* stop is a question of law reviewed de novo, *Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Tirrell*, 120 F.3d 670, 674 (7th Cir.1997), while findings of historical fact are reviewed for clear error, *Ornelas*, 517 U.S. at 699, 116 S.Ct. 1657.[4] Additionally, in the context of a motion to suppress, we give special deference to the district court's rulings due to the fact-specific nature of the proceeding. *Griffin*, 150 F.3d at 783 (citing *United States v. Stribling*, 94 F.3d 321, 323 (7th Cir.1996)).

■■■■ In this case, we must apply the foregoing legal standards to two questions: first, whether the officers had a reasonable suspicion to stop and detain Ienco; and second, whether the initial detention exceeded the bounds of a *Terry* stop and amounted to an unlawful arrest. The government argues that the police officers had

---

**4.** The government does not contest the district court's findings of historical fact on this appeal.

a reasonable suspicion to stop and detain Ienco and Iovine based on the following: (1) the 911 dispatch stating that two men were causing a disturbance at the address; (2) Berman's statement that "they're in the building" along with his not commenting when the officers confronted Ienco and Iovine; and (3) the fact that the two men walked out of the building as the officers pulled up. According to the government, this combination of circumstances was enough to create a reasonable suspicion that Ienco and Iovine were involved in the disturbance at Greenberg's building.

We find the government's argument unpersuasive for several reasons. First, the police dispatch stating that "two men" were causing a disturbance in Greenberg's lobby provided no description of the two men. It did not specify the race, approximate age, height, weight, or hair color of either man, nor did it describe what either was wearing. Officer Angarone testified that the reason he stopped Ienco and Iovine was his "hunch" that they were the two men about whom Greenberg called 911. Reasonable suspicion to make an investigative stop, however, requires more than a mere "hunch." *United States v. Tipton,* 3 F.3d 1119, 1122 (7th Cir.1993). Even "inspired hunches" do not invest the police with the authority to "stop people at will." *United States v. Sholola,* 124 F.3d 803, 812 (7th Cir.1997). In fact, Angarone testified that the two men walking out of the building did not look out of place or suspicious; rather, he thought that they looked like businessmen who "[v]ery easily fit[ ] into this neighborhood and that building" and who "did not appear to be involved in anything to me." (Tr. 199–200). Thus, the very officer whose reasonable suspicion, if extant, could have permitted a *Terry* stop acknowledged that he had no basis other than a hunch to suspect that Ienco

and Iovine were the men he had been alerted to investigate.

Next, the government argues that because Berman never told the officers that they had stopped the wrong men, the officers could assume that they had the right ones, and that this silence contributed to the officers' reasonable suspicion that Ienco and Iovine were involved in criminal activity. The defendant, on the other hand, argues that Berman's failure to comment could not provide articulable suspicion because it came *after* Angarone ordered the two men to "stop, don't move" with his hand on his gun. It is true that reasonable suspicion must exist at the time the officer stops an individual, *see United States v. Smith,* 3 F.3d at 1095; it cannot come after the fact. However, we are not willing to preclude that something occurring contemporaneously with a *Terry* stop can never be part of the totality of circumstances adding up to reasonable suspicion. On these facts, though, where the record does not reflect Berman's location during the encounter, Berman's contemporaneous silence is not probative. Just as he did not indicate that the officers had the wrong men, he also did not say "you've got them" or "those are the guys."[5] We conclude that no inference can be drawn either way from Berman's silence.

Even if one were to assume that the officers had a reasonable articulable suspicion that Ienco and Iovine were involved in criminal activity, and therefore had a legitimate basis for conducting an initial investigative stop, the officers' conduct thereafter exceeded the bounds of *Terry* and resulted in an arrest. Given the endless variations in facts and circumstances, courts have been unable to develop a bright-line test to determine when police-citizen encounters exceed the

---

5. In fact, Judge Coar found that after Officer Angarone locked Ienco and Iovine in the car and entered the building, he discovered Berman hiding behind a partition in the lobby. The first thing Berman asked was "Did you get them?" As with his failure to speak when the police stopped the two men, many inferences can be made from this question, including that Berman did not see any of the encounter between the police and the two men, an inference which would render his silence meaningless.

bounds of mere *Terry* stops. *See United States v. Ocampo*, 890 F.2d 1363, 1368–69 (7th Cir.1989) (citing *Florida v. Royer*, 460 U.S. 491, 506–07, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). In this case, the officers took Ienco and Iovine's driver's licenses and, after a pat down revealed no weapons, removed the contents of their pockets and kept their wallets and licenses. On facts similar to these, courts have found that an arrest rather than a *Terry* stop occurred. *See Florida v. Royer*, 460 U.S. at 501–02, 103 S.Ct. 1319 (where officers in an airport identified themselves as narcotics agents, told the defendant that he was suspected of transporting narcotics, and asked him to accompany them to a police room, while retaining his airline ticket and driver's license without indicating in any way that he was free to depart, the defendant was effectively seized for purposes of Fourth Amendment); *United States v. Gonzalez*, 763 F.2d 1127, 1131–32 (10th Cir.1985) ("arrest" found where police held driver's license, car registration and title); *United States v. Miller*, 589 F.2d 1117, 1127 (1st Cir.1978) (police officer's retention of the defendant's driver's license which prevented the defendant from lawfully driving his car was more of an arrest than a mere investigatory stop). Here, the officers retained Ienco's personal effects for a significant period of time and never told him he was free to leave, the strong indicia of an arrest, not merely a *Terry* stop.

█ Additionally, and perhaps most compelling in the context of this case, is the fact that the officers held Ienco and Iovine in a locked police car for approximately half an hour. The government argues that because this initial detention of Ienco was brief and minimally intrusive, it did not transform a *Terry* stop into an arrest. While the government is correct in stating that the duration of the detention is not necessarily dispositive, an unduly intrusive stop is prohibited. *See Florida v. Royer*, 460 U.S. at 500, 103 S.Ct. 1319 ("an investigative detention must be

temporary and last no longer than is necessary to effectuate the purpose of the stop .... The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time"). Here, once the police discovered that Ienco and Iovine were unarmed and apparently not dangerous, there was no compelling need for the type or length of restraint imposed. Instead, as the district court found, Ienco was placed in the car without his consent and required to wait there for thirty minutes. Most significantly, the district court also found that Officer Angarone testified falsely when he stated that Ienco consented to the search and detention in the locked police car. It is apparent then, from the district court's determinations, that Ienco was not "free" to leave if he wanted to, because the police car was locked from the outside. Thus, the government's assertion that this investigative stop was not unduly intrusive cannot overcome Judge Coar's uncontested findings of fact.

In *Ienco I*, we stated that if Ienco's version of events is believed, then Ienco was unlawfully arrested. 92 F.3d at 567. It is clear that Judge Coar credited most of Ienco's testimony over Officer Angarone's. As the government does not dispute Judge Coar's factual findings, we cannot second guess them here. *See United States v. Griffin*, 150 F.3d at 783 (special deference is given to district court rulings in the context of motions to suppress due to the fact specific nature of those proceedings). Applying the law to those findings, we hold that the district court did not err in concluding that Ienco was unlawfully arrested.

**B. Van search.**

The district court suppressed the evidence found in the van rented by Ienco and Iovine as the fruit of the illegal arrest, a decision which the government challenges on appeal.

In *Ienco I*, we stated:

[I]f Ienco's version of the encounter with the police is believed, the search of the van was illegal, because according to him, the police arrested him before they had spoken to him or Iovine, or to Greenberg, and thus before they had probable cause to think that Ienco and Iovine had attempted an illegal entry. *Id.* We further stressed, "if the arrest was illegal, evidence obtained by the discovery of the key hidden in the police car and the ensuing discovery, impoundment, and search of the van would be inadmissible, all that being the fruit of the unlawful arrest." *Id.*[6]

 The exclusionary rule is a judicially created remedy that prohibits the government from introducing at the defendant's trial evidence of guilt obtained through violations of the Fourth Amendment. *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). A district court's application of the fruit of the poisonous tree doctrine in the context of the Fourth Amendment is reviewed de novo. *United States v. Elie*, 111 F.3d 1135, 1140 (4th Cir.1997). The test for determining the admissibility of evidence obtained through a chain of causation that began with an illegal arrest is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quoting Maguire, *Evidence of Guilt*, 221 (1959)). Thus, if the causal chain between the ini-

tial illegality and the evidence sought to be excluded is broken, the link to the evidence is sufficiently attenuated to dissipate the taint of illegal conduct. *United States v. Green*, 111 F.3d 515, 521 (7th Cir.1997). It has been noted that the purpose of this attenuated connection test is to mark the point of diminishing returns of the deterrence principle inherent in the exclusionary rule. LaFave, *Search and Seizure*, § 11.4(a), at 235 (1996). Moreover, "[i]t is critical that courts wrestling with 'fruit of the poisonous tree' issues keep that fundamental notion in mind, for when it is lost sight of the results can be most unfortunate." *Id.* Three factors for determining whether the causal chain is sufficiently attenuated to dissipate the taint of illegal conduct are: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Green*, 111 F.3d at 521 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

 The government asserts that the evidence in the van was not tainted by any detention. Examining the temporal question first, the government argues that the four hour lapse between the formal arrest at 6:00 p.m. and the search of the police car which yielded the van keys at 10:00 p.m. weighs in favor of attenuation. However, on these facts, where we are dealing with an inanimate object left for a relatively short period of time rather than the conduct an individual, we are forced to conclude otherwise.[7] Obviously, the key

---

6. The defendant argues that this language is the law of the case and disposes of the issue. The government asserts that *Ienco I* is not the law of the case because it was predicated on different facts than the ones present here. Specifically, it claims that Ienco changed his testimony regarding where he ran into the officers (on the street as opposed to when he was exiting the building) between the first and second suppression hearings. Also, the government argues that Judge Coar did not credit Ienco's testimony at the first hearing that the officers did not talk to Berman before

stopping Ienco and Iovine. Because we now have Judge Coar's complete findings before us, which the government accepts, we determine it appropriate to provide some additional analysis on this question rather than simply rely on our previous language.

7. This situation is distinguishable from the more typical fact pattern where the time between the illegality and the acquisition of evidence is considered significant, such as the situation where a second confession given hours after an illegal confession is held to be

was left in the police car sometime between the moment Ienco and Iovine were placed in the backseat at approximately 5:30 p.m. and the moment when they got out of the vehicle at the police station shortly after they were formally arrested at 6:00 p.m. Therefore, even accepting a four hour time period, the key's existence in the squad car, without some intervening event, does not persuade us to hold that this block of time, standing alone, conclusively weighs in favor of attenuation.[8] As this court has held, the interval between the police misconduct and the acquisition of evidence is not itself dispositive and must be considered along with any intervening circumstances. *Green*, 111 F.3d at 521.

The second factor—whether any intervening event occurred between the Fourth Amendment violation and the acquisition of the challenged evidence—is the one which is central to our analysis. The government advances that the formal arrest at 6:00 p.m. was an intervening event, cutting off the causal connection between the initial arrest and the van search, and thus purging the evidence in the van of the initial taint. In making its argument, the government relies on *United States v. Green*, where the police stopped a car in which they believed Williams, a wanted fugitive, might be riding because the car had been observed parked in front of his home on one occasion. 111 F.3d at 520.

The officers obtained the identification of the car's occupants, David and Avery Green, and ran a computer check which revealed that Avery was wanted on a warrant. This occurred within five minutes of the initial detention. The police promptly arrested Avery, and when a search of the car pursuant to that arrest revealed narcotics and a gun, they arrested David. There was no claim that the Greens fit Williams' description and this court held that based on those circumstances the *Terry* stop was not "justified at its inception." *Id.* However, we upheld the denial of David's motion to suppress the evidence on the grounds that it was seized pursuant to the valid arrest of Avery, which was an intervening event between the initial illegal detention and the acquisition of the evidence. Yet, in so holding, we cautioned

> [o]ur conclusion that the evidence is admissible in this case also will not lessen the impact of the exclusionary rule on unconstitutional automobile stops because the general rule of exclusion is unchanged. It is only in the unusual case where the police, after a questionable stop, discover that an occupant is wanted on an arrest warrant that the intervening circumstances exception will apply.

*Id.* at 523.

*Green* is plainly distinguishable from the present case on its facts and limited

sufficiently attenuated from the initial illegality to dissipate the taint. *See Holland v. McGinnis*, 963 F.2d 1044, 1050–51 (7th Cir. 1992) (a second confession given six hours after a coerced confession and which occurred in a different city with different officers and new *Miranda* warnings was held admissible); *see also United States v. Daniel*, 932 F.2d 517, 521 (6th Cir.1991) (a second confession was admissible where it was given one day after the first confession, in a different place, and taken by a different officer, following a voluntary waiver of *Miranda* rights); *United States v. Manuel*, 706 F.2d 908, 912 (9th Cir.1983) (confession was admissible where it occurred eighteen hours after an unlawful arrest and police conduct was not flagrant). Significantly, the Supreme Court has held that a confession that followed

an illegal arrest by six hours was not sufficiently attenuated to purge the taint of the illegal arrest where the defendant was in custody the entire time. *See Taylor v. Alabama*, 457 U.S. 687, 691, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). Like the petitioner in *Taylor*, Ienco was in police custody the entire four hours.

8. Though we recognize why the government argues that there was a four hour period pointing toward attenuation, this time frame does not appear to be the appropriate one. The truer focus for possible attenuation is the period between the formal arrest at 6:00 p.m. and whenever Ienco and Iovine exited the car at the police station—clearly an interval considerably less than four hours.

scope.[9] We choose not to extend its application of the intervening circumstances exception to the exclusionary rule to the circumstances here, where the "intervening event," the formal arrest, did not sever the causal connection between the initial illegality and the police's discovery of evidence in the van. As noted above, because the key could easily have been left in the police car during the initial illegal detention, the subsequent legal arrest cannot presumptively serve to break the link.

Since there was no testimony concerning when Ienco and Iovine left the keys in the police car—whether it was during the initial thirty minute illegal detention or whether it was on the way to the police station following the subsequent lawful arrest—the government would have us assume that they were left there after the latter. If that were the case, the search which uncovered the keys might appropriately be considered one incident to the lawful arrest and bring this case closer to *Green*. However, because the government bears the burden of proving that the discovery of the key was not tainted by the initial illegal conduct, and has failed to demonstrate that the keys were more likely left after the lawful arrest, we must accept the possibility that they ended up on the floor of the police car during the illegal portion of the detention—indeed, considering how events unfolded, a most probable occurrence. *See United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir.1980) (defendant has the initial burden of establishing a factual nexus between the illegali-

ty and the challenged evidence, but the government must prove that the particular evidence or testimony is not the fruit of the poisonous tree); *see also United States v. Crouch*, 528 F.2d 625, 629 (7th Cir.1976) (although the defendant must initially go forward with specific evidence demonstrating taint, where an illegal search is involved, the government has the ultimate burden of persuasion to show that its evidence is untainted).[10] Under these speculative circumstances of potential equipoise, the possibility that the key was the fruit of the initial custody cannot be excluded, and the subsequent legal arrest cannot, on this record, remove the presumed taint.[11]

■■■ Finally, we note whether the existence of purpose and flagrancy of official misconduct plays a role in this case. We stressed in *Green* the fact that "there was no evidence of bad faith on the part of the police," an inquiry that is critical to the existence of purpose or flagrancy. *Green*, 111 F.3d at 523. However, we also observed in *Green* that, if present, this factor can tip the balance away from attenuation. *Id.* (citing *United States v. Boone*, 62 F.3d 323, 325 (10th Cir.1995)). Here, we concur with the government that neither the initial stop, nor the search of the police car at 10:00 p.m. were flagrant or purposeful. But, as discussed above, and unlike in *Green* and *Boone*, the lack such misconduct is of no moment because there was no intervening event to break the connection to the initial arrest.

■■■ Thus, with Ienco's initial detention constituting a violation of his

9. Unlike the minimally intrusive nature of virtually simultaneous computer checks in connection with automobile stops, which this court implicitly recognized in *Green*, here the defendant was forced to sit in a locked police car for thirty minutes.

10. Further, we find it difficult to accept the government's position regarding the placement of the key in light of the fact that it presumably could have provided evidence on this issue through its witness at the suppression hearing, Ienco's former co-defendant Iovine.

11. The present case is distinguishable from *United States v. Walker*, in which the Fifth Circuit held that an initial illegal arrest did not taint evidence found in a search pursuant to a second lawful arrest. 535 F.2d 896, 898 (5th Cir.1976). In *Walker* it was clear that the search was incident to—and occurred after—the officer had probable cause and legally arrested the defendant. As discussed above, it is not evident in this case whether the instant search was incident to the illegal or legal arrest because they are inextricably linked.

Fourth Amendment rights and because the government has not shown how the connection between such custody and the evidence found in the van was severed, we conclude that the evidence was appropriately suppressed.[12]

### C. Iovine's testimony.

■ The government also challenges the district court's grant of Ienco's motion to suppress Iovine's custodial statements and subsequent trial testimony on the grounds that they were tainted by the illegal detention.

At approximately 4:15 a.m. on August 30, 1994, while Iovine was in custody, the police obtained a statement from him that there was black powder in his and Ienco's hotel room and that the black powder could be made into something dangerous. Initially, Iovine maintained his innocence and jointly filed with Ienco the motion to suppress the evidence against both of them, including his custodial statement.

Following the original trial judge's ruling that the evidence from the van and hotel searches was admissible, Iovine ultimately entered a guilty plea and agreed to testify for the government.

The government urges on appeal that Iovine's decision to plead guilty and testify against Ienco was an intervening event that removed any taint from the illegal detention because it was made of Iovine's free will. Thus, it is argued that the allegedly illegal arrest bears no causal relation to the acquisition of Iovine's testimony. The government further claims that while Iovine's own arrest may have affected his decision to plead guilty and cooperate, Ienco's did not. In other words, it is Ienco's arrest that is the poisonous tree, not Iovine's.[13]

■ In *United States v. Ceccolini*, the Supreme Court set forth the factors to be used for determining when the exclusionary rule should be invoked where the claim

**12.** The government does not argue that the key was abandoned and that Ienco therefore lacks standing to challenge the search, and for good reason. The question of abandonment in this context also depends on whether the key was left in the car pursuant to the lawful or unlawful arrest. When evidence left by a defendant has been discovered in a police car following a legal arrest or detention, courts have held that the evidence was voluntarily abandoned. For example, in *United States v. Maryland*, 479 F.2d 566, 568 (5th Cir.1973), the court held that counterfeit money which had been found in the back seat of a police car after the defendant had been lawfully arrested and transported to the local courthouse in that car was voluntarily abandoned by the defendant, who therefore had no standing to challenge the search. *See also United States v. Wai–Keung*, 845 F.Supp. 1548, 1559 (S.D.Fla.1994) (where an arrest was properly made, the defendant's leaving items in the backseat of a police car constituted an abandonment of those items, and such abandonment was voluntary because the lawful arrest did not in and of itself amount to such a compulsion as to render an otherwise voluntary abandonment involuntary).

However, when evidence is left in a squad car after an illegal arrest, it is not voluntarily abandoned for purposes of the Fourth Amendment and the evidence should be ex-

cluded. For instance, the court in *Maryland* indicated that the legality of the arrest in that case was critical to its determination, because "a loss of standing to challenge a search cannot be brought about by unlawful police conduct." 479 F.2d at 568. Additionally, in *Lawrence v. Henderson*, 478 F.2d 705 (5th Cir.1973), after deciding that the defendant had been unlawfully arrested, the court held that drug evidence found in the police car could not have been voluntarily abandoned by the defendant because the "abandonment" was compelled by the police misconduct. Thus, because it is impossible to determine whether the key was left in the police car pursuant to the unlawful seizure or the subsequent lawful arrest, we cannot conclude that Ienco voluntarily abandoned his privacy interest in the key.

**13.** We are unconvinced by the government's argument that Iovine's testimony can only be the fruit of his own tainted arrest, not of Ienco's, because we agree with the defendant that the illegal stop and arrests of Ienco and Iovine cannot be causally separated. The officers stopped Ienco and Iovine because they were two men together. Had they not been together, there most probably would have been no stop, no arrest or no detention. As the district court stated, "Iovine was arrested because he was with Ienco, and vice versa."

is based on a causal relationship between a constitutional violation and the discovery of a live witness. 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).[14] Those factors are: (1) whether the testimony given by the witness was an act of free will or coercion or induced by official authority as a result of the initial illegality, *id.* at 276, 98 S.Ct. 1054; (2) whether the illegality was used in questioning the witness, *id.* at 279, 98 S.Ct. 1054; (3) how much time passed between the illegality and contact with the witness and between the contact and the testimony, *id.;* (4) whether the identity of the witness was known to the police before the illegal conduct, *id.*; and (5) whether the illegality was made with the intention of finding a witness to testify against the defendant, *id.* at 280, 98 S.Ct. 1054. In setting forth these factors, the Court cautioned that "the exclusionary rule should be invoked with greater reluctance" where the claim seeks to suppress live witness testimony than when it "is advanced to support suppression of an inanimate object." *Id.*[15]

■ Applying these factors to Iovine's testimony, we conclude that the district court did not err in suppressing his statements. First, it cannot confidently be said that neither Iovine's initial statements nor his subsequent testimony were made of his own free will over which the government's action played no part. A court should look to "the time, place and manner of the initial questioning of the witness" in order to determine whether "any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness." *Id.* at 277, 98 S.Ct. 1054. Iovine's first statements to the police were made at 4:15 a.m. after he had been in custody and questioned at the police station for almost eleven hours. He did not have an attorney present, nor was he read his *Miranda* rights. Additionally, it is important to note that Iovine's subsequent confession and trial testimony were made after Judge Duff denied the motion to suppress the van evidence—a decision which was later found to have been made in error. Thus, faced with the choice between testifying against Ienco for a lighter sentence or going to trial where tainted and incriminating evidence would be used against him, Iovine chose to testify. The circumstances surrounding both sets of statements made by Iovine strongly suggest that he was not speaking of a free will uninfluenced by the initial illegality. Rather, his actions appear dictated by his own precarious legal situation—a circumstance forged by the illegal arrest and search.

Second, the government failed to establish that its early morning interrogation of Iovine, which happened a few hours after

14. The facts of *Ceccolini* are as follows: In late 1973, the FBI was investigating suspected gambling operations in North Tarrytown, New York. The defendant's flower shop was one of the places under surveillance. One year after the surveillance was terminated, a local police officer spent his patrol break in the flower shop talking to his friend, Lois Hennessey, a shop employee. While there, the officer picked up an envelope lying on the drawer of the cash register and discovered that it contained cash and gambling slips. Without telling Hennessey what he had seen, he learned from her that the envelope belonged to her employer. The officer mentioned the incident to a local detective, who passed on the information to an FBI agent. Four months later, the FBI agent interviewed Hennessey, without referring to the incident with the patrolman. Hennessey told the agent that she was willing to help, then told him about the events which had occurred during the patrolman's visit four months earlier. The defendant was summoned before a grand jury and testified that he had never taken gambling bets at the flower shop. He was convicted of perjury based on Hennessey's testimony. The district court granted his motion to suppress and the court of appeals affirmed. The Supreme Court reversed. 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

15. It is important to note that in finding the witness's testimony admissible in *Ceccolini*, the Court highlighted the significance of the fact that the witness was not a "putative defendant," which is not the situation with Iovine. *Id.* at 275, 98 S.Ct. 1054.

the illegal van search, was not tainted by that search. Indeed, the government acknowledges that during this questioning, Iovine was told about the evidence found in the van. Also, as mentioned above, Iovine only agreed to confess and testify at trial after the initial trial judge ruled that the evidence from the van search and the hotel search was admissible. Clearly, the government did not make the requisite showing to the district court indicating that Iovine's decision to plead guilty was not in fact tainted by the evidence seized and "thus the [g]overnment has not rebutted the logical inference on these facts that the incriminating 'evidence' discovered in the course of the illegal search was used to persuade the[ ] witness[es] to testify." *United States v. Rubalcava Montoya,* 597 F.2d 140, 143 (9th Cir.1978).[16]

Third, substantial time did not pass between the illegal detention and search and contact with Iovine. The Supreme Court found it significant in *Ceccolini* that the illegal search occurred approximately four months before the police contacted the witness whose testimony the defense sought to exclude. 435 U.S. at 279, 98 S.Ct. 1054. Here, Iovine was "contacted" immediately. He was continuously detained and questioned by the police until he gave his statement eleven hours after the initial illegal arrest, and approximately

seven hours after the discovery of the key which led to the van search.

The fourth factor also indicates that Iovine's statements were properly suppressed. The government has not demonstrated that Iovine's identity could have been discovered absent the illegal arrests and searches. As the district court observed, "the government's ability to uncover Iovine was intrinsically related to the arrest of Ienco and Iovine, for the sole justification that the police had for stopping Ienco and Iovine and looking at their identification was that they were two men leaving a building where a disturbance involving two men had been reported." The Chicago police had no knowledge of either Ienco or Iovine prior to the illegal arrest and, as contrasted with the situation in *Hoffman,* the government did not have an ongoing, independent investigation of criminal activity before Ienco and Iovine were arrested. 385 F.2d at 503.[17]

Unlike the testimony of the disinterested, voluntary witness in *Ceccolini,* Iovine's custodial statements and subsequent trial testimony are similar to those suppressed in *United States v. Rubalcava Montoya,* 597 F.2d 140. In that case, following an illegal search of a car for aliens, the testimony of the aliens found in the car was suppressed as fruit of the illegal search

**16.** The chief case relied on by the government, *United States v. Hoffman,* 385 F.2d 501 (7th Cir.1967), does not address the unique situation we have here where a co-defendant pleads guilty and testifies for the government after the trial court incorrectly admits evidence in violation of the exclusionary rule. In *Hoffman,* this court held that the unlawful arrest of multiple defendants convicted of a conspiracy to transport in interstate commerce counterfeit money orders did not immunize them from prosecution and testimony of their accomplice, Fears, who was illegally arrested with them. We further held that the testimony of a witness disclosed by Fears was admissible against the defendants notwithstanding the claim that because of the unlawful arrest, such testimony was the tainted fruit of the poisonous tree. We noted:

While the unlawful arrests did serve to result in a disclosure of the true identities of Fears [and the defendants], all of whom

had registered at the motel under other names, the existence of these persons, their association together, and the fact that some stolen money orders had been left behind in the motel room occupied by one of them, were facts which became known apart from any disclosure resulting from the arrests and unlawful search and seizure. These facts supplied an adequate basis for the investigation which followed and culminated in the filing of the informations.

385 F.2d at 503.

**17.** As to the fifth factor, we do not believe that the initial illegality, the arrest, was made with the intention of finding a witness to testify against Ienco. However, this factor alone cannot tilt the balance in favor of the government's position in light of the rest of the *Ceccolini* factors which support suppression.

**532**

because "the testimony of the witnesses [was] so closely, almost inexorably, linked" with the search. *Id.* at 144. *See also United States v. Karathanos,* 531 F.2d 26, 35 (2d Cir.1976) (where, in a prosecution for harboring and concealing illegal aliens, testimony of illegal aliens had been procured by the government as the result of an illegal search and was prompted by the government's promise to allow the witnesses to voluntarily depart without prosecution if they testified, the witnesses' decisions to testify could not accurately be characterized as intervening acts of free will of sufficient independence to purge the primary taint of the unlawful search, and the exclusionary rule would therefore not be relaxed so as to allow admission of such witnesses' testimony). Here, Iovine's testimony was so inexorably linked with the illegal arrests of both men and with the illegal searches, that it is impossible to conclude that it was not fruit of the government's illegal conduct. Therefore, applying the standards set forth in *Ceccolini,* we find that the district court's determination that Iovine's statements were inadmissible was not in error.

### III. CONCLUSION

The objective of the Fourth Amendment exclusionary rule is to "deter unreasonable searches, no matter how probative their fruits." *United States v. Patino,* 830 F.2d 1413, 1419–20 (7th Cir.1987) (quoting *Oregon v. Elstad,* 470 U.S. 298, 306, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). We are mindful of the impact of suppressing evidence critical to the prosecution of wrongdoers, and the result in this case highlights the significant cost of this societal choice. However, the dictates of this constitutionally driven penalty for governmental error compel the result we arrive at in this case. For the reasons stated herein, we AFFIRM the judgment of the district court granting Ienco's motion to suppress.