MAGNUS-STINSON, District Judge.
If ordered, suppression of unconstitutionally obtained evidence can permit “[t]he criminal ... to go free because the constable has blundered.” People v. Defore, 242 N.Y. 13, 150 N.E. 585, 587 (1926) (Cardozo, J.). Given a blunder that the Government does not dispute here, Defendant David Conrad argues that the district court should have suppressed all the evidence of child pornography that was recovered following an illegal entry into his *730 father’s home.[1] As we explain below, however, the district court correctly denied exclusion of evidence obtained from Mr. Conrad’s own home — an hour’s drive away from the home that had been illegally entered and which Mr. Conrad authorized the Government to search. That evidence was sufficiently attenuated from the original illegal entry so as to have been purged of the unconstitutional taint. With that evidence, he was convicted and, despite his arguments to the contrary, correctly sentenced in accordance with the Sentencing Guidelines in effect at the time of his conviction, rather than at the time of his offenses.
I.
Background
Before granting in part and denying in part Mr. Conrad’s motion to suppress evidence, the district court held an evidentiary hearing. See United States v. Conrad) 578 F.Supp.2d 1016 (N.D.Ill.2008). Because the parties disavow any challenge to the accuracy of those factual findings, the district court’s findings presented below will govern on appeal.
A. The Geneva Home
While the FBI was executing a search warrant for child pornography at a business owned by Mr. Conrad’s father, federal and state law enforcement were staked outside the father’s house, in Geneva, Illinois (the “Geneva Home”), looking for Mr. Conrad. For simplicity, we will refer to all law enforcement officials as “agents.” Despite having received information from the father, who was away on vacation at the time, that Mr. Conrad was likely at the father’s home and despite the presence of Mr. Conrad’s car in the driveway, periodic knocks on the door went unanswered.
Eventually, without either a warrant or permission from Mr. Conrad’s father and with the intent to further their investigation, agents went around the back of the Geneva Home. After knocking on the patio door on the lower level, they climbed a set of stairs and entered onto the deck that abutted the main level of the home. By either standing on or leaning across the deck’s elevated railing, they peered into a bay window and saw Mr. Conrad asleep on the couch, with a pill bottle nearby. An FBI agent telephoned Mr. Conrad’s father and told the father, incorrectly, that the pill bottle was located on a coffee table next to Mr. Conrad, when it was actually in the kitchen. The agent also said that Mr. Conrad was lying still on the couch and that the agents were concerned about his health. The district court accepted that the concerns were “credible],” though the concerns were not sufficient to give rise to legal “exigency” under the circumstances. Conrad, 578 F.Supp.2d at 1039. In any event, after hearing that information, Mr. Conrad’s father told the agents the location of the spare key and authorized them to enter the Geneva Home to check on Mr. Conrad.
Upon entering the Geneva Home, the agents discovered Mr. Conrad in good health; he had simply been asleep on the couch after having taken a prescription narcotic. Once Mr. Conrad had been roused from his sleep, the agents began questioning him about child pornography. He admitted to having child pornography on a laptop in his car, which he voluntarily *731 provided to them. He also “volunteered” that he had additional evidence of child pornography in his apartment in Chicago (the “Chicago Apartment”), Conrad, 578 F.Supp.2d at 1037. He willingly agreed to provide it to them, even though the agents told him that he was not in custody and that he did not have to take them' to the Chicago Apartment.
B. The Drive to the Chicago Apartment
Approximately fifteen minutes after having first entered the Geneva Home, and without having searched it, the agents left the Geneva Home for the Chicago Apartment. Mr. Conrad rode with two agents, sitting in the backseat, uncuffed. During the approximately one-hour drive to the Chicago Apartment, Mr. Conrad smoked a cigarette and had free use of his cell phone, which he used to call his father. His father told him not to talk to the agents.[2] Mr. Conrad replied to his father: “It’s no problem.”
C. The Chicago Apartment
The agents and Mr. Conrad arrived at the Chicago Apartment approximately two hours after the agents had stepped foot onto the curtilage of the Geneva Home without permission. After the agents and Mr. Conrad entered the Chicago Apartment, the agents read Mr. Conrad his Miranda rights, even though he was not in custody. He fed his cat, cleaned the litter box, and showed off some of his equipment for mixing music. About twenty minutes later, once the agents were ready to begin questioning him, Mr. Conrad signed an advice-of-rights form.
Despite Mr. Conrad’s initial claim to the contrary, the district court found that Mr. Conrad never requested an attorney during his questioning, knowingly and voluntarily waiving his right to counsel and to remain silent. He admitted that he had operated a file server for child pornography, that he had child pornography on his computer, and that he had transferred child pornography from his laptop onto an external hard drive. He also confirmed additional incriminating information that the agents had developed during their investigation.
Mr. Conrad signed two other consent forms, after having been advised of his right to refuse to permit the search. In one, he gave written consent for the agents to search his apartment. In another, he gave specific written consent for the agents to search two laptops and an external hard drive, and gave oral consent to search another computer. The agents took some of those items with them when they left. They left Mr. Conrad behind; they did not arrest him that day.
After finding the facts set forth above, the district court held' that the agents’ warrantless entry onto the back deck violated Mr. Conrad’s rights under Fourth Amendment, given that he had a reasonable expectation of privacy in his father’s home, including the home’s curtilage. As a remedy, the district court suppressed all evidence and statements obtained at the Geneva Home and from the car ride to the ■Chicago Apartment. It did not, however, suppress the evidence and statements that the agents obtained at the Chicago Apartment, finding that they were too attenuat *732 ed from the constitutional violation to merit suppression.
A jury ultimately convicted Mr. Conrad of eight counts relating to child pornography. After considering the Sentencing Guidelines in effect on the date of sentencing, the district court sentenced Mr. Conrad to 198 months’ imprisonment, rather than the guideline range of 360 months to life.
II.
Discussion
Mr. Conrad raises two issues on appeal. In the first, he argues that the district court erred when it refused to suppress the evidence and statements obtained in the Chicago Apartment. Second, he asks us to overrule our decision in United States v. Demaree, 459 F.3d 791 (7th Cir.2006), by holding that the Sentencing Guidelines in effect at the time of his offenses, rather than at the time of his conviction, should apply.
A. The Motion to Suppress
Although Mr. Conrad raised other potential constitutional violations below in his quest for exclusion of the evidence from the Chicago Apartment, he has abandoned the others in favor of the only violation that the district court found: the violation of the Fourth Amendment with respect to the curtilage of the Geneva Home. He argues that the district court erred in applying the attenuation exception to the evidence from the Chicago Apartment; he wants that evidence excluded as fruit of the poisonous tree, too.
We review the district court’s application of the law to the uncontested facts de novo. United States v. Ienco, 182 F.3d 517, 526 (7th Cir.1999) (citation omitted).
The Supreme Court has long recognized the need to exclude evidence obtained in violation of the Constitution’s protections. E.g., Weeks v. United States, 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Indeed, unless one of various exceptions applies, exclusion will run not only to the unconstitutionally obtained evidence, but also to the fruits of that evidence — the so-called fruit of the poisonous tree. See, e.g., Silverthome Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920) (“The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.”) (Holmes, J.). The exclusionary rule thus seeks to discourage official misconduct by removing the incentive to obtain evidence in violation of the Constitution. United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (“[T]he rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.” (footnote omitted)). Where exclusion will not “efficaciously” promote those “remedial objectives,” no exclusion will occur. Id.
“The Supreme Court developed an exception to the exclusionary rule for cases where an arrest or search involved a Fourth Amendment violation but the connection between the illegal conduct and the subsequent discovery of evidence ‘beeome[s] so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost.’ ” United States v. Carter, 573 F.3d 418, 422 (7th Cir.2009) (quoting Brown v. Illinois, 422 U.S. 590, 609, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring)) (alteration in original). In other words, the attenuation inquiry determines the point at which the government began obtaining evidence “by means sufficiently distinguishable to be purged of the *733 primary taint.” Brown, 422 U.S. at 599, 95 S.Ct. 2254 (quotation omitted). The Government bears the burden of identifying that point, id. at 604, 95 S.Ct. 2254, which requires the balancing of three factors: “(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct,” Ienco, 182 F.3d at 526 (citations omitted).[3]
We will examine the three relevant factors in turn and then collectively, to determine whether the Government met its burden to show attenuation, as the district court found. In conducting that analysis, we will necessarily hew to the unique facts that the district court found, which are uncontested on appeal.

1. The Lapse of Time

As for the first factor, the lapse of time, “there is no ‘bright-line’ test,” United States v. Reed, 349 F.3d 457, 463 (7th Cir.2003) (citations omitted), which is unsurprising given the fact-intensive nature of the attenuation inquiry. The district court found here that two hours elapsed between the curtilage violation and the collection of evidence in the Chicago Apartment. Depending on all the attendant circumstances, two hours may, or may not, be sufficient to purge the taint of a constitutional violation from later-collected evidence. Compare, e.g., Taylor v. Alabama, 457 U.S. 687, 691, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (six hours insufficient); Brown, 422 U.S. at 604, 95 S.Ct. 2254 (two hours insufficient as to original statement and ten hours insufficient to follow-up statement); Ienco, 182 F.3d at 526 (four hours insufficient); with Rawlings v. Kentucky, 448 U.S. 98, 107-08, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (forty-five minutes sufficient); United States v. Parker, 469 F.3d 1074, 1078 (7th Cir.2006) (“matter of minutes” sufficient).
On balance, we agree with the district court that this first factor weighs more in favor of attenuation than suppression. First, in terms of quantity, two hours from the violation of the curtilage to the collection of the evidence at issue is not insubstantial. We note in particular that Mr. Conrad’s consent for law enforcement to enter and search the Chicago Apartment, and to question him, came after an hour’s car ride. Second, in terms of quality, the car ride afforded Mr. Conrad the opportunity to reflect upon his circumstances, with the help of a cigarette and counsel from his father. At no point during the episode — according to the uncontested findings below — was he ever in the custody of law enforcement for the purposes of the Fifth Amendment or otherwise subject to a seizure within the meaning of the Fourth Amendment. Conrad, 578 F.Supp.2d at 1040-41. In other words, although in law enforcement’s presence, “a reasonable person in the defendant’s position would have believed that he was free to leave” at any time. United States v. Snodgrass, 635 F.3d 324, 327 (7th Cir.2011) (citation omitted) (Fifth Amendment). And “his freedom of movement’’ was never “restrained” through “means of physical force or a show of authority.” United States v. Mendenhall, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Fourth Amendment “seizure”). That situational context helps the passage of time *734 attenuate the underlying violation here. See Rawlings, 448 U.S. at 107-08, 100 S.Ct. 2556 (explaining that “the precise conditions” of the detention — characterized by its “congenial atmosphere” — made up for the otherwise quantitatively “short” passage of time, thus permitting the time factor to weigh in favor of attenuation).
In his attempt to shorten the period under consideration, Mr. Conrad incorrectly asks us to focus only on the time between the agents’ entry into the Geneva Home and his decision to agree to take them to -his Chicago Apartment — in other words, fifteen minutes. While that decision may have been a “but for” cause of his repeated consents for the agents to search his Chicago Apartment, we must not conflate the identification of the violation— here, the agent’s improper entry onto the curtilage at the Geneva Home — with the scope of the remedy for that violation. “But for” causation is not enough. Hudson v. Michigan, 547 U.S. 586, 592, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (“[Exclusion may not be premised on the mere fact , that a constitutional violation was a ‘but-for’ cause of obtaining evidence. Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression.”).
The two-hour period between the underlying violation and the consents in the Chicago Apartment is the appropriate unit of analysis. Given the nature of that period, this first factor tips in favor of attenuation.

2. Any Intervening Circumstances

The second factor in the balancing looks to see whether any intervening circumstances have occurred that might “sever the causal connection between [the violation] and the discovery of the evidence.” Reed, 349 F.3d at 464. Again, the highly fact-intensive nature of the attenuation inquiry precludes sweeping generalizations about the circumstances that will be relevant for any particular case. Some cases finding this factor present have focused on the presence of “a non-custodial voluntary consent ... as an independent intervening event,” United States v. Liss, 103 F.3d 617, 621-22 (7th Cir.1997), so long as that consent was neither obtained “immediately after an illegal entry,” United States v. Robeles-Ortega, 348 F.3d 679, 683 (7th Cir.2003), nor obtained following an “illegal stop[], detention[] or arrest[],” United States v. Jerez, 108 F.3d 684, 695 & n. 13 (7th Cir.1997) (collecting cases). Further, Miranda warnings, though never alone sufficient to establish attenuation given the differing purposes of the Fourth and Fifth Amendments, Taylor, 457 U.S. at 690, 102 S.Ct. 2664, can nonetheless be a relevant consideration, see Reed, 349 F.3d at 463 (describing voluntariness of confession as “important,” though not so powerful as to overcome other considerations on the facts presented). In other cases, the fact that the evidence was obtained at a location away from the site of the original violation became important. See, e.g., New York v. Harris, 495 U.S. 14, 20, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (“[Suppressing the statement taken outside the house would not serve the purpose of the rule that made Harris’ in-house arrest illegal. The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded____”); United States v. Fazio, 914 F.2d 950, 958 & n. 12 (7th Cir.1990) (collecting cases). In still other cases, courts have relied upon the defendant’s ability to “contact counsel or friends about [the defendant’s] predicament.” United States v. Patino, 862 F.2d 128, 133 (7th Cir.1988).
*735 Consistent with existing precedent, the district court identified intervening circumstances that favored attenuation: Mr. Conrad’s repeated consents to search and his waiver of Miranda rights (which law enforcement was not even required to give because he was not in custody), about two hours after the underlying constitutional violation and in a completely different location. As for the different location, we note that in contrast to cases where no attenuation was found after the defendant was taken, for example, to a police station, e.g., Taylor, 457 U.S. 687, 102 S.Ct. 2664, here Mr. Conrad volunteered to go from his family home, a location where, according to the unchallenged findings of the district court, he “was undoubtedly comfortable,” Conrad, 578 F.Supp.2d at 1037, to a location that was as yet unknown to the agents, the Chicago Apartment. He was likely as or more comfortable there, and thus in a better position to decide whether to stand on his constitutional rights there. Furthermore, because the Chicago Apartment was independently protected under the Fourth Amendment, extending the scope of the exclusion would have little additional deterrent effect. Cf. Harris, 495 U.S. at 20, 110 S.Ct. 1640 (“Even though we decline to suppress statements made outside the home following a Payton [v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ] violation, the principal incentive to obey Payton still obtains; the police know that a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home. If we did suppress statements like Harris’, moreover, the incremental deterrent value would be minimal.”).
Although the district court did not explicitly rely on it for this second factor, we also attach particular significance to another, rather unusual, circumstance. Mr. Conrad not only could use his cell phone to obtain advice about his predicament, but he actually did — and was, as the district court found, specifically told by his father “not to talk to the officers.” Conrad, 578 F.Supp.2d at 1025. While he suggests that his decision to ignore that advice was in recognition that he had already confessed to so much that he had no choice but to continue, the district court found, and he does not contest, that his statements were voluntary. Id. at 1036-37. The voluntariness of his statements — made despite superfluous Miranda warnings, a specific warning from his father, and after an hour to think in the car and twenty minutes to think while tending to his cats and showing off music equipment — help establish that his conduct at the Chicago Apartment was “sufficiently an act of free will to purge the primary taint of the unlawful invasion.” Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (footnote omitted).
Secure within the sanctity of his own home — one different and far away from the one that had had its curtilage violated — Mr. Conrad clearly wanted to speak rather than insisting upon his rights, repeatedly explained, to send law enforcement away. We find that this second factor also weighs in favor of attenuation.

3. The Purpose and Flagrancy of the Underlying Violation

The final factor that informs the attenuation analysis — that is, “the purpose and flagrancy of the official misconduct — is considered the most important because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct.” Reed, 349 F.3d at 464-65 (citations omitted). This factor considers both the conduct before and after the constitutional violation. See id. “Bad faith” cuts against attenuation. Carter, 573 F.3d at 425-26 (citation omitted). So do- actions that were otherwise “coercive or calculated *736 to cause surprise, fright or confusion” and “actions ... undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence.” Reed, 349 F.3d at 465.
Below, the district court found that what began as purposeful conduct morphed into conduct consistent with attenuation by the time of the Chicago Apartment. The agents violated the curtilage of the Geneva Home “to advance their investigation.” Conrad, 578 F.Supp.2d at 1036. But the agents were “professional” inside the Chicago' Apartment and did not enter it as part of a “fishing expedition.” Id. at 1037-38. Given those findings, the district found that while the third factor helped justify exclusion of the evidence obtained in the Geneva Home and in the car ride to the Chicago Apartment, the findings would not help justify excluding evidence obtained in the Chicago Apartment. Id.
We agree that this • third factor very slightly tips in favor of attenuation. Importantly, the agents gave Mr. Conrad Miranda warnings while they were in the Chicago Apartment, even though those warnings were not legally required, and advised him in writing of his right to refuse to permit them to search his property. While certainly not a complete salve for the initial violation of the curtilage — hence the exclusion of the other, important evidence — the entirety of their conduct in the Chicago Apartment shows that their earlier constitutional blunder reflected only a temporary lapse in judgment, which had been cured by the time they entered the Chicago Apartment. Scrupulous though belated adherence to constitutional standards is not irrelevant in the fact-intensive inquiry into attenuation, which ultimately seeks to regulate law-enforcement behavior, Calandra, 414 U.S. at 348, 94 S.Ct. 613. We thus agree with our dissenting colleague, infra at 741, about one “takeaway for law enforcement,” from our finding that this factor slightly tips in favor of attenuation: “if you think you may have gone beyond what the Fourth Amendment allows,” by all means go out of your way to avoid even-the slightest hint of constitutional impropriety going forward. Doing so may not ultimately avoid suppression, but it might help.
A The Final Balance
As indicated above, because of the somewhat unusual facts in this case, all three relevant factors tip in favor of attenuation regarding the Chicago Apartment, though none overwhelmingly so. We do not, therefore, need to balance them before concluding that the district court correctly identified the point at which evidence became purged of the taint from the curtilage violation: once the agents and Mr. Conrad entered the Chicago Apartment. The constitutional protection of the Geneva Home’s curtilage was adequately vindicated here by excluding the evidence obtained there, including on the car ride away. Any marginal deterrence obtained by suppressing the evidence that Mr. Conrad was readily willing to “volunteer” at his Chicago Apartment, Conrad, 578 F.Supp.2d at 1037, despite time to think first and a counsel from his father, would have been excessive and thus improper. See United States v. Leon, 468 U.S. 897, 910, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (“[I]t does not follow from the emphasis on the exclusionary rule’s deterrent value that anything which deters illegal searches is thereby commanded by the Fourth Amendment.” (citation omitted)).
B. Sentencing in Accordance with Demaree
As for whether we should overturn our precedent in Demaree and hold that the *737 district court should have considered the Sentencing Guidelines in effect at the time he committed his crimes rather than when he was actually sentenced, we can be brief. As we have stated previously, “[w]e have reaffirmed our decision in Demaree many times ..., and we will not overrule it here.” United States v. Robertson, 662 F.3d 871, 876 (7th Cir.2011) (collecting cases).[4]
III.
Conclusion
The judgment of the district court is Affirmed.

. The Government advises that while it has chosen not to challenge the district court’s finding that a constitutional violation occurred, it does not mean to concede that we would, if asked, ultimately agree that a violation occurred. For the purposes of this appeal, we will assume without deciding that the district court correctly found a constitutional violation.

. Because Mr. Conrad's opening brief stipulates that he "has not attempted to contest any of the' underlying findings that gave rise to the district court's ruling,” [Appellant Opening Br. at 12], we do not address the argument he raised in a posthearing letter that the district court erroneously determined the contents of the call.

. When the evidence takes the form of a confession or other incriminating statement, voluntariness becomes a threshold issue of its admissibility. See Brown, 422 U.S. at 604, 95 S.Ct. 2254 (citation omitted). Because Mr. Conrad does not challenge the district court's finding of the voluntariness of his statements to law enforcement, we need not revisit that threshold finding.

. Furthermore, even if it were appropriate to reconsider that decision in some other case, it would not be this one. After computing the guideline sentence, the district court found the sentence excessive given the statutory factors that courts must consider when selecting the appropriate sentence, 18 U.S.C. § 3553(a). It chose, therefore, to impose a non-guideline sentence. Had the district court consulted the earlier Sentencing Guidelines, as Mr. Conrad urges, its application of the § 3553(a) factors would have likely resulted in a finding that the lower guideline sentence was inadequate and imposed the higher one that it selected here.