In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1209

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ADRIAN RUIZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cr-00421-1 — **Robert W. Gettleman**, *Judge.*

ARGUED JANUARY 23, 2015 — DECIDED MAY 8, 2015

Before WOOD, *Chief Judge*, and KANNE and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. Law enforcement officers approached Adrian Ruiz's car after they witnessed Ruiz engage in what they deemed to be suspicious behavior, including actions consistent with operating a "trap"—a concealed, non-factory compartment in a vehicle often used to hide drugs. Ruiz consented to the search of his car and then followed the officers to a nearby police station where he

showed the officers two traps in his car loaded with heroin. Ruiz eventually pleaded guilty to possession with intent to distribute more than 100 grams of heroin, *see* 21 U.S.C. § 841(a)(1), reserving the right to appeal the denial of his motion to suppress all evidence derived from his encounter with the officers. Ruiz appeals, contending: the officers did not have reasonable suspicion to stop his vehicle; the stop exceeded its lawful purpose and ripened into a de facto arrest; the encounter with the officers was custodial, requiring the suppression of all statements he made prior to receiving *Miranda* warnings; and he did not consent voluntarily to go to the police station and open the traps.

## I.     BACKGROUND

During the afternoon of October 26, 2010, Drug Enforcement Agency ("DEA") Special Agent Keith Bakewell and DEA Task Force Officer Jay Tapia (collectively, the "officers")—driving separate, unmarked cars but in radio communication—were surveilling a storefront in Gurnee, Illinois. Based upon a prior drug seizure and information from confidential informants, the officers believed that the store was being used by drug dealers to ply their trade. The officers saw Michael Coleman, who they knew had prior drug-trafficking convictions, exit the rear of the store and get into a blue Pontiac. Agent Bakewell followed Coleman as he drove into a residential neighborhood. Bakewell, who entered the neighborhood approximately a minute after Coleman, saw Coleman's Pontiac parked in the middle of the street beside a black Cadillac Escalade that was registered to the primary target of the officers' drug-trafficking investigation. Soon after Bakewell came into view, the two cars drove away from each other. Bakewell followed the black Escalade

to a strip-mall parking lot, where the black Escalade parked next to a silver Escalade that was registered to another target of the investigation. It appeared to Bakewell that the occupants of the two Escalades were engaged in a conversation. The officers then followed the silver Escalade as it left the strip-mall parking lot and drove to the parking lot of another mall, the Gurnee Mills Outlet Mall ("Gurnee Mall"). Officer Tapia testified that, based upon his training and experience, narcotics transactions often occur in mall parking lots because the high volume of pedestrian and vehicle traffic can mask drug-dealing activity.

The silver Escalade parked in the Gurnee Mall parking lot, but nobody exited the vehicle. Agent Bakewell then saw, for the first time, the person he would later identify as Defendant Ruiz walking toward the front passenger-side of the silver Escalade. It appeared to Agent Bakewell that Ruiz was directed to walk to the other side of the car, and Ruiz eventually entered the Escalade through the rear, driver-side door. Two or three minutes later, Ruiz exited the Escalade, walked in one direction, turned around, and then walked in the opposite direction towards an unoccupied Honda Accord parked nearby. Ruiz entered the Accord through the driver's door. Agent Bakewell next saw the Accord's rear brake lights activate and Ruiz began manipulating "some of the … driver controls" in the vehicle, such as those controlling the air conditioner, the windshield wipers, and the windows. Bakewell then saw Ruiz reach behind the driver's seat and appear to "put something in the rear passenger" area of the vehicle. Bakewell testified that, based upon his experience and training with the DEA, the Chicago Police Department, and the Illinois State Police, trap compartments can exist "[a]nywhere there is a natural void" in a vehicle and

can be opened by manipulating the controls of a vehicle in the manner done by Ruiz.

Ruiz then started the Accord and pulled out of the mall parking lot, with the officers covertly following. At this time, Ruiz was driving in what Agent Bakewell described as a "normal, everyday manner," such as going "a couple of miles an hour over the speed limit" and "signaling when he [got] to the intersection, not before." Officer Tapia phoned a Gurnee Police Department ("Gurnee PD") officer and asked her to attempt to "develop independent probable cause for a stop" of Ruiz's Accord, in an effort to make Ruiz believe it was a random traffic stop with no involvement by the DEA. When the marked Gurnee PD squad car neared the Accord, Ruiz began driving in a "very cautious" manner, driving five miles an hour below the speed limit and signaling well in advance of turns. Bakewell noted that the Accord had Wisconsin plates but drove past the on-ramp for the interstate that led toward the Illinois-Wisconsin border.

Ruiz eventually turned into a residential driveway with a "for rent" sign in the yard. The squad car drove past the parked Accord and continued along the residential street. Once the marked squad car was out of sight, Agent Bakewell—who had pulled his unmarked vehicle into a nearby driveway—saw the Accord's brake lights activate and then Ruiz manipulated the driver controls and reached around to the rear of the vehicle in the same manner as he had done in the Gurnee Mall parking lot. Ruiz next put the Accord in reverse and began backing out of the driveway. The Accord had moved only a few feet backward when the marked squad car drove back into view; Ruiz then stopped his car

and deactivated the brake lights, apparently shifting into park.

The squad car parked on the street two houses south of Ruiz's Accord, and the Gurnee PD officer stayed in her car. Agent Bakewell and Officer Tapia pulled their unmarked vehicles into curbside parking spaces to the north and south of the driveway where Ruiz sat. Bakewell and Tapia, both in plainclothes and not displaying weapons, approached the driver's window of the Accord on foot and identified themselves as law enforcement officers. In response to Tapia's questions, Ruiz said he was interested in the house advertised as being for rent and he had previously been at the Gurnee Mall visiting a furniture store.[1] Tapia asked Ruiz to get out of the car, and Ruiz did so. Upon request, Ruiz provided the officers with his driver's license, which listed his address as a city in southern Texas that Tapia characterized as "a source city for narcotics." The Accord was registered to an address in Kenosha, Wisconsin.

In response to Tapia's questions, Ruiz denied having drugs or hidden compartments in the car. Tapia asked if he could search the car, and Ruiz consented. A ten-minute search turned up nothing, save for two cell phones. The interior of the car was "spotless" and had no other personal effects, which the officers believed was suggestive of the car being a "trap car" used for drug trafficking.[2] Tapia called for

---

[1] Ruiz had parked his car near a Sears and a Sports Authority in the Gurnee Mall parking lot. However, there was a furniture store elsewhere in the mall.

[2] The officers testified that there is a perception among drug dealers that a car containing many personal items invites closer scrutiny by law enforcement.

a canine unit to come to their location to sniff Ruiz's car, but none was available. Tapia then asked Ruiz if he would drive to the nearby Waukegan police station, because Tapia (who was a member of the Waukegan Police Department) believed he could access a canine unit there. Ruiz agreed to drive to the station. The encounter between Ruiz and the officers in the driveway lasted a total of approximately 30 minutes.

Because neither Ruiz nor Bakewell knew how to get to the station, Tapia led the way in his unmarked car, followed by Ruiz in the Accord and Bakewell in his unmarked car. Neither officer activated his emergency lights during the drive (or at any other time during the encounter). Ruiz maintained possession of his driver's license and cell phones. The Gurnee PD squad car did not join the procession; instead it drove off in a different direction. At the station, Ruiz parked in a public parking lot and exited his vehicle. While Tapia called for a canine unit, Bakewell spoke with Ruiz. Bakewell told Ruiz that he thought he had seen Ruiz operating a trap in the Gurnee Mall parking lot. Ruiz responded that he was engaged to be married and was "worried about going home that night." Bakewell told Ruiz if he cooperated by opening the trap, the prosecutor would view this "act of good faith" with favor. Ruiz initially denied that the Accord had a trap, but after overhearing Bakewell and Tapia discuss the request for a canine unit, Ruiz conceded the car had two traps and agreed to open them for the officers. Approximately 10 to 15 minutes after parking in the station lot, Ruiz went through the process of manipulating the controls and opening the traps in the Accord, revealing heroin inside each. After following police procedures for retrieving and storing the drugs, the officers escorted Ruiz into the station. Ruiz signed

a written waiver of his *Miranda* rights and then made incriminating statements. Thereafter, Ruiz was allowed to leave the station.

Approximately eight months later, a criminal complaint was filed charging Ruiz with possession with intent to distribute more than 100 grams of heroin in violation of § 841(a)(1). Ruiz filed a motion to suppress, and the district court conducted an evidentiary hearing with Tapia and Bakewell as the only witnesses. At the conclusion of the hearing, the judge announced that the motion was denied because he found that the officers' testimony (from which the above-recounted facts were derived) was credible; the officers had reasonable suspicion for a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968); the officers would have let Ruiz go if he had asked to leave; and Ruiz voluntarily consented to the search of his car, to drive to the police station, and to open the traps.

On September 21, 2012, Ruiz entered a conditional guilty plea pursuant to a written plea agreement, preserving his right to appeal the denial of the motion to suppress. The agreement states that, during October 2010, Ruiz completed two transactions, whereby Ruiz sold a total of nearly 600 grams of heroin to a buyer for a total of $36,000. The buyer subsequently complained to Ruiz about the quality of 285.9 grams of the heroin and asked for a refund of $18,000. Ruiz agreed to the refund—perhaps because he was committed to providing good customer service, or perhaps because he feared the dissatisfied buyer might do something more drastic than simply complain.[3] On October 26, 2010, after retriev-

---

[3] Given that the buyer was suspected of being a member of an organization known as the "Maniac Latin Disciples," the latter seems more likely.

ing the heroin from the buyer's vehicle in the parking lot of the Gurnee Mall, Ruiz returned to his car and placed the bags of heroin inside two traps. Ruiz then left the parking lot and drove toward Wisconsin with the intent to distribute the heroin to another—perhaps less-discerning—individual.

The district court thereafter imposed upon Ruiz a below-Guidelines sentence of three years of imprisonment and four years of supervised release.

## II.    DISCUSSION

When reviewing a district court's decision on a motion to suppress, we review findings of historical fact for clear error and conclusions of law (as well as mixed questions of law and fact, such as determinations of reasonable suspicion) de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Uribe*, 709 F.3d 646, 649 (7th Cir. 2013). Ruiz challenges the district court's factual finding that his consent was voluntary, which is addressed below; otherwise, Ruiz does not mount a serious challenge to the factual findings of the district court, and we do not find them to be clearly erroneous. *See United States v. Bullock*, 632 F.3d 1004, 1011 (7th Cir. 2011) ("Under clear error review, we will not overturn the district court's factual findings unless left with a definite and firm conviction that the district court was mistaken. We give special deference to the district court's credibility determinations.") (quotation omitted). Ruiz instead contends that, even accepting the officers' testimony as truthful, his motion to suppress should have been granted.

Ruiz first argues that his motion should have been granted because the officers did not have reasonable suspicion to approach and detain his vehicle in the residential driveway. "An investigatory stop complies with the Fourth Amend-

ment if the brief detention is based on reasonable suspicion that the detained individual has committed or is about to commit a crime." *Uribe*, 709 F.3d at 649–50 (citing, *inter alia*, *Terry*, 392 U.S. at 21–22). The officers initiating the investigatory stop must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts," suggest criminal activity. *Terry*, 392 U.S. at 21. "[I]narticulate hunches" will not suffice. *Id*. at 22. However, "[r]easonable suspicion is a lower threshold than probable cause" and "considerably less than preponderance of the evidence." *Bullock*, 632 F.3d at 1012 (quotations omitted). "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). This is an objective standard, based upon the facts available to the officers at the moment of the seizure. *Terry*, 392 U.S. at 21–22.

"[I]n determining whether officers had the requisite particularized suspicion for a *Terry* stop, we do not consider in isolation each variable of the equation that may add up to reasonable suspicion. Instead, we consider the sum of all of the information known to officers at the time of the stop." *Matz v. Klotka*, 769 F.3d 517, 523 (7th Cir. 2014) (citation omitted), *cert. denied*, 83 U.S.L.W. 3720 (U.S. Apr. 27, 2015). In other words, "courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Bullock*, 632 F.3d at 1012 (quotation omitted).

Reasonable suspicion can arise from "behavior that may in other circumstances be considered innocent; in other words, context matters." *Matz*, 769 F.3d at 523.

The government presented numerous facts in support of its position that reasonable suspicion existed at the time the officers approached Ruiz in the driveway. The officers had observed a series of suspicious encounters between three different vehicles—one was driven by an individual with drug convictions and the other two were registered to the subjects of an ongoing drug-trafficking investigation. These encounters culminated with Ruiz entering one of the vehicles in a mall parking lot—a type of location favored by drug dealers. Prior to entering the car, Ruiz appeared to be redirected from the front passenger-side to the rear driver-side. After exiting the car, Ruiz appeared to have trouble locating his car, perhaps because he simply forgot where he parked or perhaps because he was not very familiar with his car. Upon entering his car, Ruiz engaged in a series of steps that—based upon the training and experience of Agent Bakewell—were consistent with the operation of a trap. The district judge specifically credited Bakewell's experience and training in this regard, which was permissible. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("This process [of determining whether reasonable suspicion exists] allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.") (quotation omitted).

Once it was clear Ruiz knew a marked squad car was following him, he passed the on-ramp to the interstate which would have taken him to Wisconsin (where his car was registered), and instead drove into a residential neighborhood

and pulled into a driveway of a house being advertised for rent. After the marked police car drove out of sight, Ruiz repeated the same steps as he had done in the mall parking lot consistent with the operation of a trap. Ruiz then began backing out of the driveway, which is inconsistent with the behavior of a person looking at the house as a potential renter. When the squad car drove back into view, Ruiz immediately stopped and put his car into park, which is consistent with the behavior of someone attempting to evade notice by the police.

In isolation, each of Ruiz's actions might be more susceptible to an innocent explanation than the not-so-innocent explanation ascribed to it by the officers. We doubt that any one of Ruiz's actions, as witnessed by the officers, would alone give rise to the suspicion necessary to justify a *Terry* stop—including his parking-lot meeting with a suspected drug dealer and taking actions consistent with the operation of a trap. *Cf. United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012) (holding that "a mere suspicion of illegal activity about a place, without more, is not enough to justify stopping everyone emerging from that property"); *United States v. Carrillo*, 269 F.3d 761, 767 (7th Cir. 2001) ("[T]he existence of a vehicle trap in itself is not enough to establish probable cause—traps may, of course, be used for legitimate purposes…."). But when all of Ruiz's actions are viewed in concert and through the lens of experienced law enforcement officers, the innocent explanations begin to look less likely and the not-so-innocent explanations begin to look more likely. *See Arvizu*, 534 U.S. at 277–78 ("Undoubtedly, each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others. Taken together, we believe they sufficed to form a particularized and objec-

tive basis for [the officer]'s stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment."); *United States v. Riley*, 493 F.3d 803, 809 (7th Cir. 2007) ("Although … all of these taken separately might not justify a stop, we do not evaluate the circumstances in isolation. Furthermore, these circumstances must be viewed through the lens of [the investigating detective], an experienced officer.") (citation omitted).

Ruiz emphasizes that the officers did not witness any drugs change hands or Ruiz carry a bag which might have contained drugs. However, a drug dealer who hides his merchandise from public view is not thereby rendered immune from a narcotics-based *Terry* stop. *See Bullock*, 632 F.3d at 1012–14 (holding that, despite seeing nothing change hands, police officers had reasonable suspicion to detain a suspect based upon an anonymous tip and observations that the suspect made several brief visits to residences and hosted several short meetings in his vehicle, which an officer testified was indicative of drug-dealing activity). Instead, considering the totality of the circumstances, we think that, by the time the officers approached Ruiz's car in the driveway, the officers could point to "specific and articulable facts which, taken together with rational inferences from those facts," suggested Ruiz was engaged in illegal activity. *Terry*, 392 U.S. at 21; s*ee id.* at 22 (holding that reasonable suspicion may exist when an officer observes individuals "go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation"). The district court correctly held that the officers had reasonable suspicion to initiate a traffic stop to investigate for the presence of narcotics in the car.

The next issue is whether, as contended by Ruiz, the investigatory stop exceeded its lawful purpose and ripened into a de facto arrest. "A *Terry* stop based on reasonable suspicion can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive." *Bullock*, 632 F.3d at 1015. "The investigation following a *Terry* stop must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *Matz*, 769 F.3d at 525 (quotations omitted); *see Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.").

With respect to the duration of the stop, there is no rigid time limit placed on *Terry* stops. *Bullock*, 632 F.3d at 1015. And a defendant's actions can contribute to a permissible extension of the stop. For example, in *United States v. Vega*, 72 F.3d 507 (7th Cir. 1995), we held that a 62-minute delay was reasonable given that the defendant initially consented to a search of his garage, but then changed his mind. *Id*. at 515–16; *see United States v. Goodwin*, 449 F.3d 766, 772 (7th Cir. 2006) (holding that duration of *Terry* stop was reasonable when the defendant "was … the co-author of the prolongation that is the fulcrum of his Fourth Amendment claim"). Likewise, assuming reasonable suspicion exists (as it did here), a reasonable delay attributable to arranging for a canine unit to conduct a sniff may permissibly extend the duration of a stop. *See Vega*, 72 F.3d at 516; *cf. Rodriguez v. Unit-*

*ed States*, --- S. Ct. ----, No. 13-9972, 2015 WL 1780927, at *6–*7 (U.S. Apr. 21, 2015) (holding that police may not extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct dog sniff).

At the outset of the stop, Ruiz gave answers which increased rather than allayed the officers' suspicions. Ruiz claimed to be parked in the driveway because he was interested in renting the house, but, as the district court noted, his "backing out of that driveway [after] the police car passed him … is inconsistent with looking at a house he might want to rent." Also suspicious was Ruiz's claim that he was at the mall to visit a furniture store, when he did not park within view of any furniture store and, unbeknownst to Ruiz, the officers had witnessed Ruiz meet with the subject of their narcotics investigation in the parking lot. The officers' suspicions were increased further by Ruiz's Texas driver's license, combined with his car being registered in Wisconsin and containing no personal items. In short, the first few minutes of the stop only served to increase the officers' reasonable suspicion that Ruiz was operating a trap car, and this justified further investigation by the officers. *See United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994) (holding that further investigation was justified based in part upon a defendant's misleading answers at the outset of a *Terry* stop).

The remainder of the time in the driveway was devoted to Tapia's search of Ruiz's car and the officers' attempt to summon a canine unit for assistance. The district court found that Ruiz voluntarily consented to the search of his car. This finding is not challenged by Ruiz,[4] and the finding

---

[4] Ruiz only challenges the voluntariness of his subsequent consent to drive to the station and open the traps, as discussed *infra*.

was not clearly erroneous. In the words of the district court, Ruiz's voluntary consent to the search was "consistent with the entire modus operandi … of the officers … mak[ing] this defendant feel as comfortable as possible while they were talking to him."

We have previously held that "the relevant focus in determining whether the seizure [in the form of a traffic stop] was reasonable in duration is the time between its initiation and the [defendant's] consent [to search the vehicle]." *United States v. Taylor*, 596 F.3d 373, 376 (7th Cir. 2010); *see United States v. Muriel*, 418 F.3d 720, 725 (7th Cir. 2005) ("The … appropriate focus … is the time that elapsed between the initial stop and [the defendant]'s consent to search; consent renders a search reasonable under the Fourth Amendment unless given involuntarily…."). The officers detained Ruiz for less than 20 minutes prior to obtaining his consent to search the car, which is a reasonable duration, given that there is nothing in the record to suggest that the officers acted less than diligently. *See Bullock*, 632 F.3d at 1015 (holding that 30-40 minute detention while police executed search warrant was reasonable when there was no indication the officers unnecessarily prolonged the search).

Tapia's ten-minute search of Ruiz's car came up empty, which is not surprising given that traps are designed to elude an officer making a quick search. Accordingly, it was reasonable for the officers to attempt to arrange for a dog sniff of the car. Upon learning that a mobile canine unit was not readily available, Tapia asked Ruiz if he would drive to the nearby Waukegan police station. Tapia was a member of the Waukegan Police Department, not the Gurnee police force. It was reasonable for Tapia to believe that he could ar-

range for a canine unit quicker while at his home station than at a residential driveway in the neighboring town of Gurnee. Had Ruiz refused the request to go to the station, we would be presented with a different case. But Ruiz consented to go (whether his consent was voluntary is an issue we will address below). His consent to the initial search and to go to the station, as well as the diligence of the officers, made the otherwise lengthy encounter—30 minutes in the driveway, 15 minutes to drive to the station, and 10-15 minutes at the station—fall within the bounds of what is acceptable for a *Terry* stop. *See Vega*, 72 F.3d at 515–16. We find that the officers' investigative detention of Ruiz lasted "no longer than [was] necessary to effectuate the purpose of the stop," and the investigative methods employed by the officers were "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500.

Ruiz next contends that his encounter with the officers was custodial, requiring the suppression of all statements he made prior to receiving *Miranda* warnings at the station. Law enforcement officers must advise suspects of their constitutional right to remain silent and to have counsel present before subjecting them to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 471–72 (1966). To determine whether an interrogation was custodial, we ask whether, "given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave." *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004)). This "inquiry is objective, and relevant factors include whether the encounter occurred in a public place; whether the [individual] consented to speak with the officers; wheth-

er the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed." *Id.*

On the "custodial" side of the ledger, the officers failed to inform Ruiz that he was not under arrest and was free to leave. Also, the manner in which the officers' vehicles— unmarked though they may have been—flanked Ruiz's car in the driveway and during the drive to the station subtly undermined the message that Ruiz was free to leave. Ruiz was asked to move from the driveway to the police station, although any custodial aspect of this was mitigated by the fact that Ruiz consented to the relocation (whether this consent was voluntary will be discussed below), and was permitted to drive his own car.

On the "non-custodial" side of the ledger, the entire encounter took place in public view. The district court found that the officers spoke to Ruiz in a calm, courteous manner throughout the encounter, which was designed to make Ruiz feel at ease. The officers were in plainclothes, with no display of weapons or force. The officers' unmarked vehicles did not block the driveway, and the marked squad car was parked across the street, two houses away. The Gurnee police officer in the squad car did not approach the driveway at any time, and she drove away in a different direction when Ruiz and the officers left the area. As the district court noted, the fact that the officers let Ruiz drive his own car to the station and retain possession of his driver's license and phones is a strong indicator that Ruiz was not in custody. When he

arrived at the police station, Ruiz parked in a public lot rather than a secure lot. The subsequent conversation between Bakewell and Ruiz occurred beside Ruiz's car in the public lot.

On balance, we think that Ruiz was not in custody prior to being *Mirandized* at the station. *See id.* at 701–02 (holding that suspect was not in custody at the time of his confession at a police station even though the questioning officers did not tell the suspect that he was free to leave, because the suspect consented to be interviewed, there was no display of force or physical touching, the officers used a monotone tone of voice, and the suspect was told he was not under arrest); *United States v. Thompson*, 496 F.3d 807, 811 (7th Cir. 2007) (same, when officers calmly questioned suspect in his home for a few hours prior to his confession, telling him that defendants who cooperated received lighter punishments); *United States v. Wyatt*, 179 F.3d 532, 536–37 (7th Cir. 1999) (same, when suspect voluntarily accompanied officers to area outside bar and then to police station despite patdown search and questioning; the suspect was uncuffed and there was no other show of force by the officers).

Ruiz's final argument is that his consent to drive to the station and then open the traps was not voluntary. The district court found that Ruiz's consent was voluntary, and therefore this portion of the encounter "doesn't really implicate the Fourth Amendment." Ruiz challenges this finding, contending that "any reasonable person in [his] circumstances would have been incapable of rendering voluntary consent."

Whether an individual's consent is voluntary is a factual determination, which we review for clear error.[5] *United States v. Richards*, 741 F.3d 843, 847 (7th Cir. 2014). To determine whether consent was provided voluntarily, we consider the totality of the circumstances, including Ruiz's age, education, and intelligence; whether he was advised of his constitutional rights; how long he was detained prior to consent; whether he consented immediately or after police made several requests; whether the police used physical coercion; and whether he was in custody. *Id.* at 848; *see Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27 (1973). We review these factors in light of the information known to the officers at the time, and "[o]ur determination does not depend on a single controlling factor, but carefully considers 'all of the surrounding circumstances.'" *Richards*, 741 F.3d at 848 (quoting *Schneckloth*, 412 U.S. at 226).

Ruiz was 10 days shy of his 20th birthday on the day of the encounter; his responses to the officers demonstrated him to be reasonably intelligent and educated. The officers did not inform Ruiz of his constitutional rights until after he opened the traps. Ruiz was with the officers in the driveway approximately 30 minutes prior to agreeing to go to the station, and then approximately 10-15 minutes at the station prior to opening the traps. Ruiz consented immediately when asked to go to the station, although he initially denied having traps in the car and only agreed to open them after

---

[5] The government contends that Ruiz forfeited the argument that his consent was not voluntary by not raising it before the district court, and therefore we should review the district court's finding for plain error rather than clear error. Because we find no clear error, *see infra*, we need not consider whether Ruiz forfeited the argument.

overhearing the officers discuss the request for a canine unit. The officers used no physical coercion, displayed no weapons, and spoke to Ruiz in a calm, conversational manner. Finally, as discussed above, we have decided that Ruiz was not in custody during the encounter—although our decision assumed that Ruiz's consent to go to the station was voluntary, so we assign little-to-no weight to this factor.

As with the determination of whether Ruiz was in custody, there are some factors tending to show his consent was involuntary, most notably, the failure to inform Ruiz of his constitutional rights and the questioning of Ruiz about the presence of a trap after he had denied that his car contained one. There are other factors tending to show Ruiz's consent was voluntary, such as the fact that the officers used no physical coercion, they spoke to him in a calm, conversational manner, and Ruiz readily agreed to go to the station. This is a factual determination, *see Schneckloth*, 412 U.S. at 227, which the district court resolved by finding that Ruiz's consent to go to the station and open the traps was voluntary. Considering the totality of the circumstances, we are not "left with the definite and firm conviction that a mistake has been committed," *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985), and we therefore hold that this finding was not clearly erroneous. *See United States v. Strache*, 202 F.3d 980, 986–87 (7th Cir. 2000).

The district court did not err in denying Ruiz's motion to suppress. Accordingly, the district court's judgment is AFFIRMED.