In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2930

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE SEGOVIANO,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cr-391-1 — **Charles R. Norgle**, *Judge.*

ARGUED APRIL 1, 2021 — DECIDED APRIL 1, 2022

Before MANION, ROVNER, and ST. EVE, *Circuit Judges.*

ROVNER, *Circuit Judge.* Jose Segoviano, Jr., was charged in
a two-count indictment with possession with intent to distrib-
ute a controlled substance and possession of a firearm in fur-
therance of a drug trafficking crime, in violation of 21 U.S.C.
§ 841(a)(1) and 18 U.S.C. § 924(c)(1)(A), respectively. In the
district court, Segoviano filed a motion to suppress the evi-
dence uncovered during a search of his apartment by agents
of the Bureau of Alcohol, Tobacco, Firearms, and Explosives

("ATF") and statements made by him to them during his detention. The court determined that no evidentiary hearing was necessary and denied the motion. Segoviano then pled guilty to both counts pursuant to a conditional plea agreement under which he reserved his right to appeal the district court's denial of the motion to suppress. Segoviano now appeals the denial of that motion.

I.

The events that led to the search began on May 4, 2018, when an ATF agent conducting a covert law enforcement operation in the Back of the Yards neighborhood in Chicago was shot. An arrest warrant was issued for Ernesto Godinez, charging him with assault of a federal agent. Two days later, agents obtained cellphone location data that placed a known telephone of Godinez at or near Segoviano's apartment building. The agents began surveillance of that apartment building at approximately 1 p.m. that day, and at approximately 5 p.m. they observed Godinez's girlfriend, Destiny Rodriguez, exit the apartment building. They detained her,[1] and a couple of hours later, at 7:23 p.m., federal agents entered the apartment building in search of Godinez. According to the agents, when they entered the vestibule of the building, they saw a closed door to their left and another

---

[1] The district court stated that the agents detained Godinez's girlfriend "allowing them to gather further information, which led to agents deciding to secure Defendant's apartment in an attempt to locate Godinez." Dist. Ct. Order at 5. There is no evidence in the record that the agents gathered evidence from Godinez's girlfriend or any other source after they detained her, nor that they decided to secure Segoviano's apartment specifically, and the government at oral argument acknowledged as much.

door in front of them that led into a stairway to the second floor. Two agents diverted to the door on the left, and the others proceeded through the door to the stairway. About halfway up the stairs, they realized that the stairs did not merely lead to a common area of the second floor, but instead led directly into a second floor apartment. They called out to the occupant of the apartment, Segoviano, who came to the top of the stairs. The agents then asked Segoviano if there was anyone else in the apartment and asked for permission to search his apartment for the purpose of determining if a fugitive, Godinez, was there. Segoviano replied that there was no one else in the apartment and consented to that search of his apartment. The agents removed Segoviano from the apartment, handcuffed him, and conducted the limited search. While the agents were calling out to Segoviano from the stairs in the initial entry, an occupant of the apartment to the left of the building entryway opened the apartment door, and two agents asked her to step back into the apartment; the agents then entered with her, conducted a sweep of the apartment at which time they found another occupant, and detained the residents of that apartment as well.

Although the search of Segoviano's apartment revealed no other persons in the apartment, the agents nevertheless kept Segoviano in handcuffs, brought him back into his own apartment, and seated him at his dining room table. Approximately 6-7 agents were present in the apartment as agents questioned Segoviano. For approximately 20-30 minutes of that questioning, Segoviano remained handcuffed, and later the agents removed the handcuffs but continued to question Segoviano. When Segoviano asked the agents if he was under arrest, they responded that he was "detained."

In the course of that interrogation, Segoviano acknowledged possessing marijuana and cocaine in the apartment, and the presence of firearms for which he possessed a Firearm Owners' Identification card. The agents informed Segoviano that based on that admission they could obtain a search warrant for the apartment, and Segoviano then signed a consent to allow the search of the apartment, the grounds, and the detached garage. The agents never provided *Miranda* warnings to Segoviano.

The search yielded four firearms, approximately 2.28 kilograms of marijuana, and approximately 95 grams of cocaine. Segoviano was subsequently charged with possession with intent to distribute cocaine and marijuana, and possession of a firearm in furtherance of a drug trafficking crime. At some point, the agents also searched the backyard and a detached garage, and found in that detached garage a white Kia Sorrento, which was the same color, make, and model of the SUV that surveillance cameras recorded Godinez entering on the day of the shooting approximately 30 minutes prior to that shooting. The agents determined that the Kia in the garage was a vehicle registered to Rodriguez.[2] During the subsequent interview at his home, Segoviano informed the agents that Godinez had visited his home earlier that day before he

---

[2] The timing and scope of the search of the garage is unclear from the record. We emphasize to district courts the importance of an evidentiary hearing where relevant facts are unclear, such as in this case the timing and nature of the search of the garage and the content of the conversation with Rodriguez. Ultimately, though, clarity as to the timing is unnecessary in this appeal as the outcome is the same even if we assume that all of the information was discovered at the time of the initial search for the fugitive.

became aware that Godinez was wanted for a criminal offense. Segoviano was never charged with any offense related to harboring a fugitive.

The district court denied his motion to suppress the evidence obtained during the interrogation and search, and Segoviano pled guilty to both counts under a conditional plea agreement that allowed him to appeal that denial of the motion to suppress. Segoviano asserts on appeal that the court erred in denying his motion to suppress, arguing that the evidence should have been suppressed because: "(1) the statements and consent were given during an unlawful detention and therefore were not voluntary; (2) the statements and search were the result of an unlawfully extended detention, which continued beyond law enforcement's stated purpose, and therefore were not voluntary; and (3) the statements were obtained as a result of a *Miranda*-less custodial interrogation." Appellant's Brief at 6.

## II.

The pre-arrest detention in this case was constitutionally problematic. As an initial matter, the agents lawfully could enter the vestibule of the apartment building, as that was a public area as to which a resident would have no reasonable expectation of privacy. See *United States v. Vargas*, 915 F.3d 417, 419 (7th Cir. 2019); *United States v. Sweeney*, 821 F.3d 893, 902 (7th Cir. 2016). And the parties agree that the entry into the stairwell was not an intentional entry into Segoviano's apartment, and was based on the false belief that the stairwell was also part of the public area of the apartment building.

According to the government, Segoviano did not challenge his initial detention during the sweep of his

apartment, which was undertaken with his consent. The government maintains that Segiviano's first challenge is to the continuing detention of him once the agents had determined that the fugitive was not present. We need not consider whether Segoviano challenged the initial seizure and handcuffing, nor whether the search of the garage was constitutional as part of that sweep, because even if we bypass those issues, the continuation of that seizure after the sweep cannot survive Fourth Amendment scrutiny.

The Fourth Amendment protects against unreasonable searches and seizures. At the "very core" of that guarantee is a person's "right … to retreat into his own home and there be free from unreasonable governmental intrusion." *Caniglia v. Strom*, __ U.S. ___, 141 S. Ct. 1596, 1599 (2021) (internal quotation marks omitted); *Florida v. Jardines*, 569 U.S. 1, 6 (2013). Accordingly, the Court has recognized that: "'[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.'" *Steagald v. United States*, 451 U.S. 204, 212 (1981), quoting *Payton v. New York*, 445 U.S. 573, 590 (1980); *Lange v. California*, ___ U.S. ___, 141 S. Ct. 2011, 2018 (2021). Absent permission, the threshold of a home therefore cannot be crossed without a warrant, subject to certain exceptions which enable law enforcement officials to address emergency situations presenting a "'compelling need for official action and no time to secure a warrant.'" *Lange*, 141 S. Ct. at 2017, quoting *Riley v. California*, 573 U.S. 373, 402 (2014). Among those recognized exceptions allowing for a warrantless entry are the need to render emergency assistance and the prevention of the imminent destruction of evidence or a suspect's escape. *Id*. at 2017. Because "'[f]reedom' in one's own 'dwelling is the archetype of the privacy protection secured by the

Fourth Amendment,'" the contours of any exception to the warrant requirement are "'jealously and carefully drawn,' in keeping with the 'centuries-old principle' that the 'home is entitled to special protection.'" *Id*. at 2018 (refusing to recognize categorical exception to warrant requirement when a suspected misdemeanant flees from police into his home), quoting *Payton*, 445 U.S. at 585, and *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). Therefore, for instance, even if they have probable cause, law enforcement agents ordinarily may not constitutionally enter a home to effectuate an arrest absent consent or exigent circumstances. *Steagald*, 451 U.S. at 212; *Lange*, 141 S. Ct. at 2017.

The Fourth Amendment protections apply equally to seizures as well as to searches. *Steagald*, 451 U.S. at 212; *Payton*, 445 U.S. at 585–86. In the case before us today, Segoviano argues that he was subjected to an unlawful detention when the agents, after conducting the sweep for the fugitive, continued the seizure, including detaining him in handcuffs, and that the subsequent statements he made to the officer and the consent to the second search were the product of that unlawful detention.

The district court, in denying the motion to suppress, determined that there was no Fourth Amendment violation in either the initial detention or the prolongation of that detention following the sweep because the detention was a proper *Terry* stop. See *Terry v. Ohio*, 392 U.S. 1 (1968). Although a number of circuits have held that a *Terry* stop is inapplicable to stops in a home or its curtilage in light of the core protection afforded the home under the Fourth Amendment, our circuit has held that such a stop within a home's curtilage can be constitutional at least in some circumstances. See *United States v.*

*Richmond*, 924 F.3d 404, 412 n.2 (7th Cir. 2019) and cases cited therein. The Supreme Court has since further reiterated the sanctity of the home, refusing to recognize a categorical exception either to allow the pursuant of a fleeing misdemeanant into the home or for community caretaking functions. See *Lange*, 141 S. Ct. at 2016; *Caniglia*, 141 S. Ct. at 1598. We need not consider whether that impacts the applicability of *Terry* to a detention in the home and its curtilage, because the reasonable suspicion standard cannot be met here even if we set aside any question as to the applicability of the *Terry* exception.

The Fourth Amendment allows officers to briefly detain and stop a person for investigative purposes even where probable cause is lacking where the officer has a reasonable suspicion based on articulable facts that criminal activity may be occurring. *United States v. Wilbourn*, 799 F.3d 900, 908–09 (7th Cir. 2015); *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry*, 392 U.S. at 21. "Reasonable suspicion" embodies less than probable cause or even a preponderance of the evidence, but more than a hunch. *Wilbourn*, 799 F.3d at 909. Significantly, "[a]n investigatory stop must be justified *by some objective manifestation that the person stopped* is, or is about to be, engaged in criminal activity … [or] is wanted for past criminal conduct." *United States v. Cortez*, 449 U.S. 411, 417 (1981) (emphasis added); *Wilbourn*, 799 F.3d at 909. "Based on that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417–18; *Brown v. Texas*, 443 U.S. 47, 52 (1979).

We have applied that standard in myriad cases. For instance, in *United States v. Ruiz*, 785 F.3d 1134 (7th Cir. 2015),

we considered whether officers had reasonable suspicion to approach and detain Ruiz's vehicle in a residential area. In *Ruiz*, drug enforcement officers had observed a series of encounters involving three different vehicles, one of which was driven by a person with drug convictions and the other two registered to the subjects of an ongoing drug-trafficking investigation. *Id*. at 1141–42. The culmination of those encounters involved Ruiz entering one of the vehicles in a mall parking lot, where he was redirected from the front passenger seat to the rear driver-side. *Id*. at 1142. Upon exiting that car, he appeared to have trouble locating his car, indicating he either forgot the location or was not familiar with the vehicle. When he entered that car, he engaged in actions consistent with the operation of a vehicle trap compartment, which is a hidden compartment in a vehicle typically used to hide items such as valuables or contraband. *Id*. Ruiz then drove away and, once it became clear that he knew a marked squad car was following him, bypassed the exit toward Wisconsin (where his car was registered), drove into a residential neighborhood, and pulled into the driveway of a house advertised for rent, but did not communicate with anyone there. *Id*. Once the marked squad car passed, he again engaged in actions consistent with the operation of a vehicle trap, and began backing out of the driveway, but immediately stopped and put his car into park when the squad car drove back into view. *Id*. We expressed "doubt that any of Ruiz's actions … would alone give rise to the suspicion necessary to justify a *Terry* stop—including his parking-lot meeting with a suspected drug dealer and taking actions consistent with the operation of a trap." *Id*. Only consideration of the totality of the circumstances provided reasonable suspicion by the time the officers approached his vehicle on that residential driveway.

In contrast, in *United States v. Ienco*, 182 F.3d 517 (7th Cir. 1999), we held that the observations by the officers were insufficient to establish reasonable suspicion. In *Ienco*, officers responded to a 911 call regarding a disturbance with two men in the lobby of an office building. *Id*. at 521. A person in a nervous and agitated state intercepted the police car as it approached the building, and told the officers "they're in the building." *Id*. As the officer pulled into the driveway, two men in business suits exited the building. The officers instructed them to stop, questioned them as to whether they saw anything in the building and their reasons for being there, and confiscated their wallets and driver's licenses. *Id*. We held that the seizure occurred when the men were ordered to stop, and that the officers lacked an articulable reasonable suspicion that the men were engaged or had been engaged in criminal conduct, noting that "even 'inspired hunches' do not invest the police with the authority to 'stop people at will.'" *Id*. at 524, quoting *United States v. Sholola*, 124 F.3d 803, 812 (7th Cir. 1997). See also *Thompson v. Wagner*, 319 F.3d 931, 936 (7th Cir. 2003) (no reasonable suspicion where the officers failed to undertake "even a modicum of additional investigation" to corroborate the informant's tip); *United States v. Lopez*, 907 F.3d 472, 483 (7th Cir. 2018) (no reasonable suspicion where the officers "failed to undertake 'even a modicum of additional investigation' to see if the Lopezes' or others' actions matched the informant's tale or to wait for Lopez's actions to create an independent basis for reasonable suspicion.").

We turn, then, to the application of the reasonable suspicion standard in this case. The government argues that the district court properly held that the agents possessed reason-

able suspicion to believe that Segoviano was engaged in criminal activity—namely, the offense of harboring a fugitive. The district court, however, based that determination on facts that fall well short of those that the Supreme Court and this court have determined sufficient to meet the reasonable suspicion standard. Specifically, the district court noted that the agents, acting on an arrest warrant for Godinez, used cellphone location data to track him to the area of Segoviano's apartment building, that they observed Rodriguez emerge from that building, and that they detained her, "allowing them to gather further information, which led to agents deciding to secure Defendant's apartment in an attempt to locate Godinez." As we noted earlier, there is nothing in the record indicating that the agents gathered any information from Rodriguez at all, and the government does not argue that it did so. The district court then proceeded to conclude that given the totality of circumstances, there was reasonable suspicion that Segoviano had engaged in criminal activity. Its analysis supporting the conclusion, in its entirety, is as follows:

> At the time Defendant was detained, agents were attempting to apprehend Godinez, a man charged with shooting another ATF agent in the face. *See* 18 CR 278, Dkt. 1 at ¶ 4. The agents were operating under the facts known to them at the time, e.g., that Godinez might have been in the area. It is reasonable to infer, that when agents found Defendant in the same area they believed Godinez to be in, the agents believed Defendant posed a serious threat to them and others given the protentional [sic] dangers involved with effectuating an arrest on a suspected gunman. See *Howell v. Smith*, 853 F.3d

892, 898 (7th Cir. 2017) (recognizing the possibility of the presence of a weapon as one instance in the limited circumstances in which the use of handcuffs is appropriate during a *Terry* stop); *United States v. Stewart*, 388 F.3d 1079, 1085 [(7th Cir. 2004)] ("To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry*.") (internal quotations and citation omitted). Therefore, the agents had reasonable suspicion to lawfully detain Defendant.

Dist. Ct. Order at 5.

Based on that analysis of reasonable suspicion at the time of the initial sweep, the court then reasoned that the continued detention was permissible under *Terry* because it was "reasonably related in scope and duration to the circumstances that justified the stop in the first instance." Dist. Ct. Order at 7. The court further held that the discovery of the white Kia Sorrento in the garage, that was the same color, make, and model as the one Godinez was seen driving 30 minutes prior to the shooting, justified prolonging Segoviano's detention. *Id*. at 8.

Those facts relied upon by the district court are insufficient as a matter of law to constitute reasonable suspicion that Segoviano was harboring a fugitive. The district court's determination of reasonable suspicion rests on facts that could indicate to the agents that "Godinez might have been in the area." There are absolutely no facts tying Segoviano or his apartment to Godinez—the fugitive as to whom the government claims to have reasonable suspicion that Segoviano is harboring—or even to Godinez's girlfriend,

Rodriguez. In order for a seizure to be based on "particularized suspicion," it must be based on some objective manifestation of criminal activity and "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Cortez*, 449 U.S. at 418. As the Supreme Court emphasized, "'[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence."* *Id.* (emphasis in *Cortez*), quoting *Terry*, 392 U.S. at 21, n.18. The agents in this case lacked any basis at all to believe that Segoviano in particular was engaged in criminal wrongdoing. There is no evidence, for instance, that the agents conducted any investigation and determined that Segoviano had any connection to Godinez—or even to Rodriguez. In fact, there is no evidence that the agents determined the identity of *any* of the persons who resided in the building. Moreover, the agents never even had evidence linking Segoviano's *apartment* with criminal activity. At best, the agents had evidence that the girlfriend of the fugitive had been present in the building, and that the fugitive's phone had been detected in the same area, but nothing linked Godinez, Rodriguez, or the phone with any particular apartment or resident of the building. To the contrary, the "particularized suspicion" in this case was premised solely on the fact that Segoviano resided in the building generally. Thus, the alleged "suspicion" in this case was generalized to the building as a whole—as is made even more clear by the agents' actions in detaining the residents of both apartments that they encountered upon entering the building.

We have repeatedly and consistently held that "[a] mere suspicion of illegal activity at a particular place is not enough

to transfer that suspicion to anyone who leaves that property." *Bohman*, 683 F.3d at 864; *United States v. Rickman*, 952 F.3d 876, 881 (7th Cir. 2020); see also *Brown*, 443 U.S. at 52 (reasonable suspicion was absent in stop of appellant in an alley because "[t]he fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct;" "[i]n short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood"); *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person"). In order to demonstrate reasonable suspicion to seize Segoviano, the facts known to the agents must demonstrate that he was "not simply proximate to criminal activity but a participant in it." *United States v. Richards*, 719 F.3d 746, 757 (7th Cir. 2013). Thus, for instance, in *Bohman*, we reversed the denial of a motion to suppress where a vehicle was stopped solely because it emerged from a site suspected to be a methamphetamine cook site, holding that the suspicion as to illegal activity at the place was not enough to justify stopping those emerging from that property. 683 F.3d at 864.

Similarly, in *United States v. Johnson*, 170 F.3d 708 (7th Cir. 1999), we held that reasonable suspicion was absent under facts that are analogous to those in this case. In *Johnson*, the police had received reports of drug activity taking place in an apartment building which identified four apartments, including apartment 7, as places in which drug dealing might be occurring. *Id*. at 711. The maintenance person for the building confirmed that he had observed a large number of people going to apartment 7, leaving quickly, and then departing through the rear building exit, leading him to believe that

there could be drug dealing occurring there. *Id*. The officers decided to conduct a "knock and talk," in which they would listen at the door of the apartment, and then knock and seek consent to search it. *Id*. Before the officers could knock, however, Johnson unexpectedly opened the door from within the apartment, startling both himself and the officers. Johnson then tried to walk past the officers, but an officer stuck out a hand to stop him and directed the other officer to take control of him, thus seizing him for Fourth Amendment purposes. *Id*. at 711–12.

We held that the seizure violated the Fourth Amendment because the officers lacked reasonable suspicion directed at Johnson, and the mere propinquity to others suspected of criminal activity was not, without more, sufficient to provide reasonable suspicion. *Id*. at 715–16. We noted that with the exception of carefully defined circumstances not applicable there, particularized suspicion as to the individual seized is required. *Id*. at 717. Those carefully defined exceptions to that requirement are inapplicable here as they were in *Johnson*, and include situations such as the seizures of persons on the premises during the execution of a valid search warrant[3], seizures

---

[3] No search warrant was obtained in this case rendering this exception inapplicable. The government at various points alleges it was executing an arrest warrant for Godinez in entering and searching the premises, but that argument was not presented to the district court, and therefore is waived. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). Moreover, the government's reliance on the arrest warrant is unavailing where, as here, the arrest warrant is used to justify the entry into the home of a third party. In *Steagald*, 451 U.S. 204, the Court directly addressed that question, and held that an arrest warrant executed in the home of a third party does not protect the interests of that third party in being free from an unreasonable search and seizure in his home. An arrest warrant serves to protect the named individual from an unreasonable seizure, whereas a

as part of a regulatory scheme, and exigent circumstances. *Id*. The government does not argue that any such exceptions apply here.

Therefore, under well-established Fourth Amendment jurisprudence, it was not enough for Segoviano to merely be present in a building in which the agents believed that Godinez could be located; the mere propinquity to Rodriguez or to a place in which Godinez might be located was insufficient to provide reasonable suspicion to detain Segoviano, whose only connection to the facts known to the agents was his residence in the building. The Fourth Amendment at its core protects the sanctity of the home—whether that is an apartment connected to other homes by common hallways or houses connected to other homes by yards and sidewalks. Apartments within a building are individual homes entitled to the same protection as homes on a street, and a suspicion that a person may be in the area is not a justification to seize

_____

search warrant safeguards a person's interest in the privacy of his home and in preventing the unjustified intrusion of the police. *Id*. at 213. Accordingly, the Court held that a search warrant was necessary for a search or seizure in a third party's home absent consent or exigent circumstances. *Id*. at 213–14; *United States v. Gillespie*, 650 F.2d 127, 128 (7th Cir. 1981). In fact, the Court noted that a contrary conclusion would create a significant potential for abuse, in that, "[a]rmed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances" or that "an arrest warrant may serve as a pretext for entering a home in which the police have a suspicion, but not probable cause to believe, that illegal activity is taking place." *Steagald*, 451 U.S. at 215. The arrest warrant, therefore, does not provide a justification for the search of the home of Segoviano, a third party, or for his seizure. In fact, the attempt to rely on the arrest warrant in this situation presents the abusive scenario decried by the Court in *Steagald*.

residents of all of the apartments in a building—just as it would be insufficient to seize the residents of all the homes on a street if Rodriguez was seen in the area of those homes and Godinez's cell phone had been detected there. See *United States v. Whitaker*, 820 F.3d 849, 854 (7th Cir. 2016) (in a Fourth Amendment challenge to a dog sniff at doors, stating that it would draw arbitrary lines to treat apartments differently from stand-alone homes, and cautioning that "a strict apartment versus single-family house distinction is troubling because it would apportion Fourth Amendment protections on grounds that correlate with income, race, and ethnicity," given the disparities apparent in the census as to households in one-unit detached houses). Because the agents had no objective basis to suspect Segoviano of criminal wrongdoing other than his presence in the same building with some potential connection to the fugitive, those facts are insufficient to support a finding of reasonable suspicion under *Terry* and therefore insufficient to support prolonging that detention as well.

Nothing discovered in the initial search for the fugitive—either in the apartment or the garage—alters that conclusion. At that point, the only additional information that the agents possessed was the discovery of the white Kia Sedona in the detached garage. Although characterized at times as "Godinez's vehicle" found in "Segoviano's garage," those are not the facts here. As the government recognizes at other points in its brief, the vehicle was located in a garage that was a common area for the use of the residents of the multi-unit apartment building, and the vehicle was registered to Rodriguez, not Godinez. The agents already knew that Rodriguez had been in the building, and therefore the presence of her vehicle in the garage for that building adds

little. At best, the agents at the time in which Segoviano was seized knew that cell phone data had placed a known telephone for Godinez near the apartment building, that Godinez's girlfriend, Rodriguez, had exited the building, and that Rodriguez's vehicle, which had been used by Godinez at least once in the past, was parked in the garage for that building. On the other hand, the agents also knew, at that point in time, that Godinez was not in fact in Segoviano's apartment. Those facts are woefully insufficient to establish reasonable suspicion that Segoviano was harboring a fugitive.

Moreover, if those facts were sufficient to constitute reasonable suspicion, it would apply to every resident of the entire apartment building. And in fact, the government at oral argument maintained that those facts known to the agents provided reasonable suspicion as to the residents of every apartment encountered by the agents upon their entrance into that building. That contention indisputably establishes that the "reasonable suspicion" alleged here is not individualized, or even isolated to a specific apartment, but rather is based on nothing more than their presence in the area in which the fugitive was suspected to be. An expansion of reasonable suspicion to include such a generalized law enforcement action would eviscerate the protections of the Fourth Amendment.

Because the continued detention in handcuffs following the sweep was itself unconstitutional, the government cannot rely on the evidence obtained during the subsequent continuation of that detention and the ensuing interrogation and search that stemmed from it. Segoviano raises a number of other Fourth Amendment challenges to the interrogation and

detention in his home, but because we determine that the detention following the sweep violated the Fourth Amendment, we need not consider those other Fourth Amendment issues.

For completeness, we address the supplemental ruling by the district court. After the district court denied Segoviano's motion to suppress, the government sought and obtained a supplemental ruling by the court that the evidence was also admissible under the inevitable discovery doctrine, but that holding is inapplicable here. The inevitable discovery determination was based on the court's conclusion that the firearm, marijuana and cocaine would have been discovered even without Segoviano's consent to the second search, because Segoviano told law enforcement about the presence of the gun and drugs before the alleged consent to the second search. Accordingly, the agents could have obtained a warrant and would have discovered those items even absent the consent. That inevitable discovery holding would be relevant if the determinative issue in this appeal was whether the consent to the second search was voluntary, but it is irrelevant to the issue as to the validity of the initial seizure itself.

Accordingly, the decision of the district court denying the motion to suppress is REVERSED, and the case REMANDED for further proceedings consistent with this opinion.